603 A.2d 1258

**Mark Edward SPARKS**

v.

**STATE of Maryland.**

No. 788, Sept. Term, 1991.

Court of Special Appeals of Maryland.

April 6, 1992.

36

Jennifer P. Lyman, Assigned Public Defender, Washington, D.C. (Stephen E. Harris, Public Defender, Baltimore, on the brief), for appellant.

Kathryn Grill Graeff, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Christian J. Jensen, State's Atty. for Caroline County, Denton, on the brief), for appellee.

Submitted before MOYLAN, DAVIS and MOTZ, JJ.

MOYLAN, Judge.

The entrapment defense is as modern as Abscam.[1] It is as ancient as the Book of Genesis: "The serpent beguiled me and I did eat."[2] On the merits, it seldom enjoys any more success today than it did in the Garden of Eden.[3] As a generative source of appellate litigation, however, it has been perennially luxuriant.

Although pioneered in the state courts,[4] it first achieved high-profile recognition in 1932 with the Supreme Court decision of *Sorrells v. United States*, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed.2d 413. *Sorrells* and progeny, notwithstanding non-constitutional status, have come to be, over half a century, the primary persuasive benchmark for a defense now recognized in all fifty states.[5]

Almost all of the Supreme Court effort, however, has thus far been lavished upon the single—and key—substantive issue of what is the essential nature of the defense. *Sorrells, supra; Sherman v. United States*, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958); *Masciale v. United*

---

**1.** *United States v. Jannotti*, 729 F.2d 213 (3d Cir.1984); *United States v. Williams*, 705 F.2d 603 (2d Cir.1983). *See also* Gershman, *Abscam, the Judiciary, and the Ethics of Entrapment*, 91 Yale L.J. 1565 (1982).

**2.** Genesis 3:13.

**3.** "Entrapment doctrine ... is no more than a curiosity, of more use to legal academics seeking tenure than to criminals seeking acquittals." Seidman, *The Supreme Court, Entrapment, and Our Criminal Justice Dilemma*, 1981 Sup.Ct.Rev. 111, 152.

**4.** *See, e.g., Michigan v. Sanders*, 38 Mich. 219 (1878); *O'Brien v. State*, 6 Tex.App. 665 (1879). A good compilation of the early developments is found in Mikell, *The Doctrine of Entrapment in the Federal Courts*, 90 U.Pa.L.Rev. 245 (1942). *See also* LaFave and Scott, *Criminal Law* § 5.2, at 421 (2d ed. 1986).

**5.** Tennessee, in 1980, was the last state to recognize the defense. *State v. Jones*, 598 S.W.2d 209 (Tenn.1980). *See* DeFeo, *Entrapment as a Defense to Criminal Responsibility: Its History, Theory and Application*, 1 U.S.F.L.Rev. 243 (1967).

*States,* 356 U.S. 386, 78 S.Ct. 827, 2 L.Ed.2d 859 (1958); *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973); *Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976).

The long-running substantive debate has been one between 1) a focus on the "Predisposition" of the defendant—the so-called subjective test—and 2) a focus on the "Conduct of the Authorities"—the so-called objective test. The former, espoused by the Supreme Court majorities in *Sorrells, Sherman, Russell* and *Hampton,* looks, on a case-by-case basis, not only at the manner and nature of the *inducement* dangled by government before a target but also (and predominantly) at the moral and social character of the target who is thus *induced.* It draws a critical distinction, in the words of Chief Justice Warren in *Sherman,* between "the trap for the unwary innocent and the trap for the unwary criminal." [6] The concern is not "to see who held out the bait, but who took it." [7] The trap itself is neither good nor bad. The critical question is whether the person caught in the trap is good or bad. [8]

A significant majority of the states have followed the lead of the Supreme Court and adopted this subjective test for entrapment. [9] In 1969, this Court opted for that approach in *Simmons v. State,* 8 Md.App. 355, 360–364, 259 A.2d 814 (1969). [10] The Court of Appeals placed its imprimatur on

---

**6.** 356 U.S. at 372–373, 78 S.Ct. at 821.

**7.** *People v. Mills,* 178 N.Y. 274, 70 N.E. 786 (1904).

**8.** A good thumbnail sketch of this subjective version of the entrapment defense is found in Park, *The Entrapment Controversy,* 60 Minn.L.Rev. 163, 165 (1976):

"[T]he 'subjective' approach, focuses upon the culpability of the particular defendant, asking whether he was predisposed to commit crimes of the nature charged. If he was ready and willing to commit the offense at any favorable opportunity, then the entrapment defense will fail even if a police agent used an unduly persuasive inducement." (footnote omitted).

**9.** LaFave and Israel, *Criminal Procedure* (1985) p. 422.

**10.** As Judge Orth stated, at 8 Md.App. 360, 259 A.2d 814:

that decision in *Grohman v. State,* 258 Md. 552, 556–560, 267 A.2d 193 (1970).[11]

The "road not taken"—the objective test for entrapment—is that espoused by Justice Roberts' concurrence in *Sorrells,*[12] Justice Frankfurter's concurrence in *Sherman,*[13] Justice Stewart's dissent in *Russell,*[14] and Justice Brennan's dissent in *Hampton.*[15] It looks to the propriety of the governmental conduct *per se* and would apply the entrapment defense essentially as a prophylactic device to monitor investigative behavior and to "police the police." Its concern is not with whether the defendant, before he took the bait, was good or bad but with whether the investigative

---

"We feel it advisable now to adopt a test for the application of the rule regarding the defense of entrapment. We believe that the view of the majority in *Sorrells,* restated in the majority opinions of *Sherman v. United States, supra,* and *Masciale v. United States,* 356 U.S. 386 [78 S.Ct. 827, 2 L.Ed.2d 859] is the better one, and adopt it."

11.  Judge Finan observed, at 258 Md. 557, 267 A.2d 193:
    "[I]t was not until *Simmons v. State,* 8 Md.App. 355, 259 A.2d 814 (1969) that a clear cut expression of the view adopted by Maryland was made."
    After quoting *Simmons,* with approval, for several pages, Judge Finan then applied the newly adopted subjective test, at 258 Md. 560, 267 A.2d 193:
    "Applying the principles of the law of entrapment as enunciated in *Simmons,* to the case at bar, we agree with the conclusion reached by Judge Digges in the lower court that the evidence does not support the defense of entrapment."

12.  287 U.S. at 453–459, 53 S.Ct. at 217–219 (joined by Justices Brandeis and Hughes).

13.  356 U.S. at 378–385, 78 S.Ct. at 823–827 (joined by Justices Douglas, Harlan and Brennan).

14.  411 U.S. at 439–450, 93 S.Ct. at 1646–1652 (joined by Justices Brennan and Marshall). A separate dissent was also filed by Justice Douglas.

15.  425 U.S. at 495–500, 96 S.Ct. at 1653–1655 (joined by Justices Stewart and Marshall).

offer of the bait was itself good or bad.[16]   As with any utilization of a prophylactic sanction, it calls for entrapment decisions to be made, as a matter of course, by the judge and not by a jury.   Some few states, legislatively or judicially, have followed this alternative approach to entrapment.[17]

At the Supreme Court level, that substantive debate is now concluded and is of no more than historical interest. As Justice Brennan acknowledged, concurring in *Mathews v. United States*, 485 U.S. 58, 67, 108 S.Ct. 883, 99 L.Ed.2d 54, 63 (1988):

> "Were I still judging on a clean slate, I would still be inclined to adopt the view that the entrapment defense should focus exclusively on the Government's conduct. But I am not writing on a clean slate; the Court has spoken definitively on this point.   Therefore I bow to *stare decisis.*"

Because of its long preoccupation with the fundamental substantive nature of the defense, however, the Supreme Court has had almost nothing to say about its procedural incidents.   Maryland, simply because of the random nature of almost all of the appellate contentions that have thus far been raised, has also had little occasion to examine the procedural nuances.   The present appeal, however, requires

---

**16.**  An equally good thumbnail sketch of this objective version of the entrapment defense is found in Park, *The Entrapment Controversy,* 60 Minn.L.Rev. 163, 165–166 (1976):

> "[T]he 'hypothetical-person' approach, focuses upon the inducements used by police agents.   If an agent used inducements likely to cause a nondisposed person to commit the crime charged, then the fact that the particular defendant was ready and willing to commit it will not defeat the entrapment defense.   Proponents of this approach hope to deter police misconduct, and to keep the criminal justice system from being soiled by unworthy action." (footnotes omitted).

**17.**  *Grossman v. State,* 457 P.2d 226 (Alaska 1969); *People v. Barraza,* 23 Cal.3d 675, 153 Cal.Rptr. 459, 591 P.2d 947 (1979); *Bailey v. People,* 630 P.2d 1062 (Colo.1981); *State v. Mullen,* 216 N.W.2d 375 (Iowa 1974); *People v. Turner,* 390 Mich. 7, 210 N.W.2d 336 (1973); *State v. Curtis,* 542 P.2d 744 (Utah 1975).  *See Note,* 68 Calif.L.Rev. 946 (1980). *See also* N.H.Rev.Stat.Ann. § 626.5 (1974); N.D.Cent.Code, § 12.01–05–11 (1976); Pa.Stat.Ann., tit. 18, § 313 (Purdon 1973).

us to stop and to look closely at one such procedural question or, more precisely, at a cluster of closely-related procedural questions: What is required to establish a legally sufficient, *prima facie* case of entrapment so as to generate a genuine jury issue with respect to it and to warrant a jury instruction on the subject? To whom is allocated the burden of production with respect to such a *prima facie* case? Who decides whether a *prima facie* case has been made—judge or jury? What are the necessary elements of such a *prima facie* case?

### The Present Case

The appellant, Mark Edward Sparks, was convicted by a Caroline County jury, presided over by Judge J. Owen Wise, of distributing marijuana. Upon this appeal, he raises the following three contentions:

1) That he was erroneously denied a jury instruction on the defense of entrapment;

2) That evidence necessary to establish the defense of entrapment was erroneously rejected; and

3) That an erroneous jury instruction a) amended and thereby broadened the charges against him, b) deprived him of his constitutional right to notice, and c) violated his right against double jeopardy.

The appellant was charged in two counts. The lesser charged simple possession of marijuana. The greater charged distribution.

Deputy Sheriff Robert Lee Bradley, an undercover narcotics officer, had been targeting one Wanda Hutson for some time. Ms. Hutson, apparently caught up in the snares of the law, agreed to extricate herself by entering into a working relationship with the police. She operated both as an informant and as an undercover agent for them. Based upon her knowledge of the local traffic, she supplied Deputy Bradley with a list of possible suppliers of narcotics. The appellant's name was on that target list. Deputy Bradley was familiar with the appellant by virtue of having

had him pointed out on several prior occasions by other deputy sheriffs. Why he was pointed out was not stated in the record.

The action plan was for Wanda Hutson to serve as a go-between and to arrange controlled buys between the targeted sellers on her list and Deputy Bradley, who would pose as an interested buyer. On February 27, 1990, Wanda Hutson arranged for such a "buy." The appellant was to come to her home at 210 East Sunset Avenue in Greensboro, Caroline County, at 11 A.M. to sell a quarter of an ounce of marijuana to Deputy Bradley. Deputy Bradley arrived a few minutes before the appellant did. Deputy Bradley knew that the appellant was the target for that morning's snare.

According to Deputy Bradley's testimony, the operation proceeded like clockwork. Deputy Bradley was seated on a sofa in the living room. The appellant entered and, while in the hallway entrance, gave Wanda Hutson a plastic baggie containing greenish-brown vegetable matter that later was found to be marijuana. The appellant and Wanda Hutson went briefly into the kitchen. She then handed the baggie to Deputy Bradley. Someone (he was not certain which of the two) handed Deputy Bradley a scale. He measured the marijuana and found that it was, atypically, "a little over a quarter ounce." Commenting favorably that "it was better than a quarter ounce," he prompted the appellant's reciprocally gracious response that "he takes care of his people." Deputy Bradley asked the appellant how much he owed him for the bag. The appellant replied, "Fifty dollars." Deputy Bradley handed the appellant $50. The appellant took it and left the house. The entire transaction lasted approximately ten minutes.

### The Defendant's Version of the Facts
### Bearing on Entrapment

The appellant gave a different version of the episode and it is, of course, his version that we must accept in determining the threshold question of whether he made out a *prima*

*facie* case of entrapment. His version of why he initially went to Wanda Hutson's house on February 27 establishes nothing with respect to entrapment, one way or the other. He claimed that he had been a social friend of Wanda for about six months. He received a call from her at approximately 9 o'clock that morning. She wanted to ask him a couple of questions about her boyfriend, specifically about whether her boyfriend was cheating on her. Accordingly, she asked him over to her home. He got a follow-up call from her at about 11 o'clock and in response to that second call, finally did go over to Wanda's house. He claimed that there was no discussion about marijuana or about any drugs of any kind, let alone a discussion about a possible sale.

The appellant did admit, however, that he carried a supply of marijuana with him on that visit to Wanda. He maintained that the marijuana was exclusively for his own personal use. This adds an interesting wrinkle, for it limits the entrapment defense to the first count charging distribution and forgoes it as to the second charging possession. We have found no other case where the allegedly improper enticement was not one that allegedly lured its victim from the ranks of the law-abiding into the underworld of criminality in the first instance but only one that allegedly pushed him upward from a lower level of criminality to a higher echelon.

Upon arrival at Wanda's, the appellant was surprised to find a stranger "sitting there and . . . walked through to the kitchen." He there "talked to Wanda for a few minutes." It was in that brief conversation in the kitchen that the subject of marijuana first arose and that the entrapment allegedly occurred. By way of a proffer initially but ultimately in the course of cross-examination and redirect examination as well, it came out that Wanda told the appellant "she needed to make this deal with this person . . . who she had befriended" and she asked the appellant "if she could have whatever marijuana he had so she could sell it to Deputy Bradley." Putting to the side for the moment the

questions of whether Wanda asked once or as many as three times and of whether Wanda was a friend of the appellant's, this "need to make a deal" was the sum total of the reason given by Wanda as to why she needed to have his marijuana.

Turning from the stated reason for the solicitation to the persistence of the solicitation, we note that when the appellant was asked, "Did you have any conversation with her?", he responded, "Yes, a little bit." When Wanda initially asked the appellant for his marijuana, he responded in the negative, causing her to ask again:

"A: I, uh, told her that I would not sell the marijuana at that time because a ...

Q: Was that the end of it, or was there anything further?

A: Well, she asked me a couple of times."

The sequence of events then becomes a little garbled. On direct examination, the appellant indicated that he then, at Wanda's request, reached into her kitchen drawer, took out the scales, and gave them to her. The request to sell the marijuana was then repeated:

"Q: Did you give anything else to her?

A: At that time, no, I just gave her the scales.

Q: Alright. What happened then?

A: I was asked to sell the pot."

There then came an interlude of "about ten minutes" during which Wanda apparently left the appellant alone in the kitchen while she talked to Deputy Bradley in the living room. Without any further explanation, the appellant gave Wanda Hutson his marijuana:

"Q: Did there ever come a time that you gave the marijuana in your possession to anyone?

A: Uh, yes, it was ... I did give it to Ms. Hutson.

Q: And that was after how long a period of time?

A: About ten minutes ... ten or fifteen minutes.

Q: This was after you had said no to her one time or had you said no on any other occasions?

A: I had told her a few times that I would not sell it."

Wanda Hutson then delivered the marijuana to Deputy Bradley:

"Q: What did she do with the marijuana?

A: She took it to Mr. Bradley.

Q: I'm sorry?

A: She took it to Officer Bradley.

Q: And where were you when that occurred?

A: I was in the kitchen.

Q: And what did she do with it?

A: She handed it to Officer Bradley. I sat around in the kitchen for a few minutes after she handed it to him and then I left."

On cross-examination, the appellant pinpointed the number of times he declined to deliver his marijuana to Wanda Hutson at three:

"Q: How many times did you say to Wanda Hutson that you would not sell marijuana at that time?

A: On three different occasions.

Q: Three different times?

A: Yes, sir.

Q: Were all three times in the kitchen when you first arrived?

A: Yes, sir."

He acknowledged, moreover, that it was right after these three requests and before the ten-minute interlude, during which he was left in the kitchen, that he turned over the marijuana:

"Q: At what point did you give your marijuana to Ms. Hutson?

A: Uh, after she asked me about three times ...

Q: Well ...

A: Well, I know. I can't say she, but, uh, what ...

A: ... point, I give it to her right before she went into the [living room] to talk to Mr. Bradley.

Q: So you gave her the marijuana before she came back to talk to Mr. Bradley? In other words, you gave her the

marijuana during that initial conversation that you had with her in the kitchen?

A: I did after I had told her no about three times.

Q: Right. You told her no about three times and then you gave it to her. Is that right?

A: Yes, I did.[18]

Q: And then she went into the living room?

A: Yes, sir."

It was while Wanda Hutson was in the living room, apparently selling the marijuana to Deputy Bradley, that she called to the appellant in the kitchen to bring her the scales (for the obvious purpose of weighing the marijuana):

"Q: Okay. Who did you give the scales to?

A: Ms. Hutson.

Q: Was she in the kitchen when she got the scales or was she in the living room ... or did you bring them to her in the living room?

A: I brought them to her in the living room and went back in the kitchen.

Q: And then went back into the kitchen?

A: Yes, sir."

The appellant stated that he received no money from Wanda Hutson (or from anyone) for the marijuana he turned over to her, although he did testify that the marijuana he gave her was worth between $40 and $50. He stated he did this "because we were friends."

The closest the appellant came to pinpointing the energizing reason for having done something he was ordinarily not inclined to do came during cross-examination. It boiled down to the fact that he distributed the marijuana to Wanda Hutson because she had, three times, asked him to do it intertwined with the fact that she was a friend:

---

18. At that point, of course, the literal crime of distributing marijuana was a *fait accompli*. The appellant had distributed marijuana to Wanda Hutson. Whether she was to be the ultimate recipient or whether she was a mere intermediary for a further delivery to Deputy Bradley was immaterial.

"A: ... I gave [it] to her so I could go about my business.

Q: So that's the reason that you gave her the marijuana so that you could go about your business?

A: So I could leave.

Q: You couldn't leave without giving that stuff to her?

A: I could have, yes. But I was doing it for a friend. You know."

On redirect examination, the motivation for the criminal act of distributing seemed to switch subtly from an act of friendship to an act of mild exasperation:

"Q: If she asked you just once for marijuana, would that be fine with you?

A: Would it be fine? No, it wouldn't be fine with me.

Q: What was it that caused you to say no three times and then finally ...?

A: Well, after a while, I got tired of listening to it so I just went ahead and give it to her."

One other pertinent fact bearing on the issue of entrapment was brought out both on direct and on cross-examination. It was that the appellant had been convicted in 1985 of selling marijuana.

### The Ruling on the Prima Facie Case

Ordinarily, a ruling on whether a defendant has made out a *prima facie* case of entrapment would be made at the close of the entire case. That ruling would control whether the jury would be permitted to consider the issue of entrapment. It would thereby control whether the judge would be required to instruct the jury on the subject of entrapment—its elements, the appropriate burden or burdens of persuasion as to aspects of entrapment, and the allocation of that burden or those burdens to one party or the other.

In this case, however, the State, quite appropriately, requested Judge Wise to rule upon whether the appellant had made out a *prima facie* case as soon as the defense rested and before the State had finally rested. If the

*prima facie* case had, indeed, not been made out, the State was then prepared to rest its entire case. If a *prima facie* case had been made out, on the other hand, and the issue were going to the jury, the State then intended to call rebuttal witnesses for the purpose of establishing the appellant's predisposition to commit narcotics-related offenses, thereby counteracting any possible entrapment defense.

The State proffered that, *inter alia*, it would put on Deputy Bradley to testify that after the criminal incident of February 27, 1990, the appellant, still believing that Deputy Bradley was a good and *bona fide* customer, approached him on two subsequent occasions "offering to sell him more marijuana" and inquiring as to whether he "was satisfied with the marijuana he had purchased from [the appellant] on the 27th." The State further proffered that this testimony was only one of "the several other pieces of evidence that would be introduced." The appellant's 1985 conviction for selling marijuana had already been brought out in evidence but it might, on rebuttal, have been developed more fully and more formally.

■ Once the possibility of entrapment has been established as a genuine jury issue, it is clear that the State acquires far-ranging latitude in offering rebuttal evidence to show the defendant's criminal predisposition that would not be allowed under any circumstances other than in counteracting the entrapment defense. As LaFave and Scott, *Criminal Law* (2d ed. 1986), pointed out at 426:

> "[O]nce the entrapment defense is raised, certain usual evidentiary rules are discarded, and the defendant will be subjected to an 'appropriate and searching inquiry into his own conduct and predisposition as bearing upon that issue.' This means a prosecutor may admit evidence of a prior criminal record, reputation evidence, acts of prior misconduct, and other information generally barred as hearsay or as being more prejudicial than probative." (footnote omitted).

That this admissible evidence of criminal predisposition includes subsequent sales of contraband and other subsequent conduct as well as antecedent conduct is clear. In *Berlin v. State,* 12 Md.App. 48, 277 A.2d 468 (1971), we ruled that in rebutting the entrapment defense the State was entitled to offer evidence of subsequent sales of controlled drugs. Judge Powers held for this Court, at 12 Md.App. 60, 277 A.2d 468:

> "That such evidence may relate to offenses *after as well as before* the one on trial was pointed out by Judge Learned Hand in *United States v. Smith,* 283 F.2d 760 (1960).
>
> The evidence then developed from appellant was that *on two later occasions he sold amphetamines* to Trooper Lawrence, probably 1,000 tablets. We conclude that the evidence was admissible for the purposes stated." (emphasis supplied).

Judge Chasanow made a thorough and scholarly survey of the same latitude on rebuttal for this Court in *Bowser v. State,* 50 Md.App. 363, 439 A.2d 1 (1981). He observed, at 50 Md.App. 372–373, 439 A.2d 1:

> "This Court has held evidence of similar criminal acts committed by a defendant admissible to rebut an entrapment defense, even where a defendant has not been convicted of nor even arrested for the other offenses, *and even where the similar crimes occurred subsequent to the offense for which the defendant is being tried....* [G]enerally where a defendant is charged with the sale of narcotics, it is improper for the State to offer evidence of other unrelated sales. Nevertheless, there is a recognized exception where the defendant claims entrapment. There the State may offer proof of other unrelated narcotics offenses to establish that the sale charged was the result of the defendant's predisposition rather than any inducement by the police." (citations omitted) (emphasis

supplied).[19]

*See also Cason v. State,* 66 Md.App. 757, 775–776, 505 A.2d 919, 929 (1986). *And see United States v. Coady,* 809 F.2d 119, 121 (1st Cir.1987).

The potential rebuttal, however, never came to pass, for Judge Wise ruled that the appellant had not established a *prima facie* case of entrapment. The State rested. The jury received no instruction on the subject of entrapment and entrapment was a non-issue as far as the jury was concerned. Upon this appeal, the appellant's primary contention is that that ruling was incorrect.

---

**19.** The Maryland position on the evidentiary latitude permitted the State in showing predisposition is totally in line with the national consensus, as evidenced by Park, *The Entrapment Controversy,* 60 Minn.L.Rev. 163, 201 (1976):

"Subsequent events may throw retrospective light upon the issue of predisposition. The fact-finder may consider, for example, whether the defendant proved to have ready access to contraband, whether a search of his dwelling turned up evidence of criminal activity, and whether he later committed other crimes of a similar nature." (footnotes omitted).

*See also United States v. Rodriguez,* 474 F.2d 587 (5th Cir.1973); and *cf. Sherman v. United States,* 356 U.S. 369, 375, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958).

The basic philosophy was set out by Chief Justice Hughes in *Sorrells v. United States,* at 287 U.S. 451–452, at 53 S.Ct. 216:

"[I]f the defendant seeks acquittal by reason of entrapment he cannot complain of an appropriate and searching inquiry into his own conduct and predisposition as bearing upon that issue. If in consequence he suffers a disadvantage, he has brought it upon himself by reason of the nature of the defense."

Chief Justice Warren spoke to the same point in *Sherman v. United States,* at 356 U.S. 373, at 78 S.Ct. 821:

"[T]he accused will be subjected to an 'appropriate and searching inquiry into his own conduct and predisposition' as bearing on his claim of innocence." (citation omitted).

The general law in this regard is well stated by LaFave and Scott, *Criminal Law* (2d ed. 1986) at 426:

"[O]nce the entrapment defense is raised, certain usual evidentiary rules are discarded, and the defendant will be subjected to an 'appropriate and searching inquiry into his own conduct and predisposition as bearing upon that issue.' This means a prosecutor may admit evidence of a prior criminal record, reputation evidence, acts of prior misconduct, and other information generally barred as hearsay or as being more prejudicial than probative." (footnote omitted).

## The Procedural Precedents Are Sparse

As we turn to the correctness of that ruling, one problem is immediately apparent. Except for the lower federal courts, to whose opinions we shall presently turn, the case law on the procedural incidents of the entrapment defense is exceedingly skimpy. In the course of eight decisions on the subject, the Supreme Court has said nothing about the proper procedures for handling entrapment issues. Despite multitudinous cases raising, directly or obliquely, the subject of entrapment, Maryland has only a meager handful of cases touching upon the procedural incidents, all of them from this Court.

## The Supreme Court Law

In *Sorrells v. United States,* 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932), the lower federal court had, to be sure, refused to submit the issue of entrapment to the jury, ruling as a matter of law that it had not been established. The Supreme Court overruled the lower federal court and remanded the case so that a jury verdict could be had on the subject. The opinion, however, was not called upon to deal with evidentiary sufficiency, allocations of burdens, or other procedural problems. The lower federal court, rather, had refused, as a matter of law, to recognize as a valid entrapment defense what the Supreme Court ultimately declared to be legitimate circumstances for asserting such a defense. Beyond that, the bulk of the majority and concurring opinions clashed at length over their different conceptualizations of the essential nature of the entrapment defense— the subjective test versus the objective test.

The Supreme Court revisited the subject twenty-six years later in *Sherman v. United States,* 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958). Chief Justice Warren and Justice Frankfurter, respectively, simply picked up the cudgels earlier wielded by Chief Justice Hughes and Justice Roberts and renewed the battle over the basic conceptualization of the defense, the subjective test again prevailing. In the lower federal court, the entrapment issue had gone to the

jury and the jury had nonetheless convicted the defendant. The Supreme Court, in a very fact-specific and clearly result-oriented decision, overturned the jury verdict and declared that entrapment had been established as a matter of law. *Masciale v. United States,* 356 U.S. 386, 78 S.Ct. 827, 2 L.Ed.2d 859 (1958), was a brief companion case handed down the same day. The Supreme Court declined to hold that on the facts of the case, entrapment had been established as a matter of law. It refused to overturn the jury verdict of conviction, which had implicitly discredited the entrapment defense.

Entrapment was only a secondary issue in both *Lopez v. United States,* 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963) and *Osborne v. United States,* 385 U.S. 323, 87 S.Ct. 429, 17 L.Ed.2d 394 (1966). In each case, a convicted defendant made the bald appellate assertion that he was entitled to a reversal of his conviction because the evidence revealed that entrapment, as a matter of law, had been affirmatively present. The Court simply held on both occasions, without any meaningful discussion, that entrapment had not been established as a matter of law.

At present, the most significant Supreme Court treatment of entrapment is its 1973 opinion in *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366. After summarizing the development of the defense, it reiterated that "the thrust of the entrapment defense [is the] focus on the intent or predisposition of the defendant to commit the crime." 411 U.S. at 429, 93 S.Ct. at 1641. Although there was adequate evidence of predisposition to support the jury verdict of guilty, the 9th Circuit had reversed the conviction. It added an element to the defense by holding that entrapment was established, as a matter of law, "solely for the reason that an undercover agent supplied an essential chemical for manufacturing the methamphetamine which formed the basis of the Respondent's conviction." 411 U.S. at 424, 93 S.Ct. at 1639. The Supreme Court reversed the 9th Circuit and held that such governmental participation in the offense by supplying necessary ingredients did not in

any way change the law and that the predisposition of the defendant to participate in the criminal activity was still a bar to any successful assertion of the entrapment defense. Four justices in dissent continued to push for the objective test conceptualization of entrapment.

In 1976, *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113, failed to produce a majority opinion. Although ostensibly raising an entrapment issue, it was ultimately held that the "case does not qualify as one involving 'entrapment' at all." 425 U.S. at 489, 96 S.Ct. at 1649. Under circumstances where the defendant was clearly possessed of a predisposition to commit the crime for which he was tried, the defense argued that the heavy governmental involvement in the case, arguably supplying narcotics to him at one end of the chain and customers to him at the other end of the chain, entitled him to a ruling that prosecution was constitutionally barred as a violation of due process. Five justices agreed that that was not so. The plurality maintained that a defendant's predisposition would always defeat a due process claim based upon governmental involvement. Two concurring justices agreed with the decision on the facts before them but hesitated to join the sweeping and absolute statement of the plurality. Three dissenting justices continued to push for the objective test approach.

*Mathews v. United States*, 485 U.S. 58, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988), dealt with a very limited issue. The federal trial court, affirmed by the 7th Circuit, refused to permit an entrapment defense to go to the jury because the defendant declined to admit having committed the offense as to which he claimed entrapment. The Supreme Court held that as long as there is evidence to generate the defense, it is appropriate for the jury to consider it and there is no bar to a defendant's assertion of alternative and apparently inconsistent positions.

Thus, except for the limited principle that inconsistent positions are permitted the defendant without dooming his entrapment defense, the Supreme Court has given no guid-

ance at all as to how to handle the many procedural problems inevitably attendant upon that defense.

## The Maryland Law

As we approach the Maryland law on the subject, we can quickly eliminate from consideration four of the 39 opinions of the Court of Appeals and of this Court that have touched upon the defense of entrapment. Those four opinions simply alluded, in passing, to the defense but offered no real illumination either upon its substance or upon the procedures for handling it.

In *Regle v. State,* 9 Md.App. 346, 264 A.2d 119 (1970), we pointed out that an entrapper cannot constitute a necessary party to a conspiracy because of the lack of a true meeting of the minds.[20] In *Tripp v. State,* 36 Md.App. 459, 464, 374 A.2d 384, 388 (1977), in the course of discussing other defenses, we referred to entrapment as an illustrative parallel, essentially pointing out that it is necessary for a defendant to generate a genuine jury issue as to certain defenses before becoming entitled to jury instructions with respect to them.[21] In *Reimsnider v. State,* 60 Md.App. 589, 600–601,

---

**20.** "It is upon this premise that the authorities all agree that if two persons are charged as conspirators and one is an entrapper, or merely feigns acquiescence in the criminal intent, there is no punishable conspiracy because there was no agreement on the part of the one to engage in a criminal conspiracy." (citations and footnote omitted).
9 Md.App. at 355, 264 A.2d 119.

**21.** As a passing *dictum,* we also said, "Entrapment could extinguish a *mens rea.*" 36 Md.App. at 464, 374 A.2d 384. That *dictum* was wrong and we take this opportunity to repudiate it. More sophisticated analysis makes it indisputably clear that even a successful entrapment defense does *not* in any way diminish the defendant's criminal *mens rea* or blameworthiness or guilt. It simply estops the State from succeeding with the prosecution.

It is obviously not some erosion of a defendant's *mens rea* that is at the heart of the defense because the same seductive influences that would establish the defense when those influences are employed by a governmental agent are utterly inefficacious to establish a defense when employed by a private person. The erosive effect on the *mens rea,* if that were all that mattered, would be the same, of course,

483 A.2d 1324 (1984), we rejected a challenge to jury instructions because the challenge was not preserved for appellate review. In *Cason v. State,* 66 Md.App. 757, 775–776, 505 A.2d 919 (1986), a case not involving entrapment at all, we, in the course of a general discussion about "other crimes" evidence, reiterated the statement from *Berlin v. State,* 12 Md.App. 48, 59–60, 277 A.2d 468 (1971), to the effect that evidence of a defendant's criminal predisposition, otherwise inadmissible, is admissible to rebut the defense of entrapment.

Of the cases dealing with entrapment by more than merely allusive reference, the first was *Callahan v. State,* 163 Md. 298, 162 A. 856 (1932).[22] It actually anticipated the first Supreme Court decision of *Sorrells v. United States* by several months. It was, however, very rudimentary. In a one-paragraph discussion, at 163 Md. 302, 162 A. 856, the Court rejected the defendant's contention that entrapment entitled him to the suppression of evidence, pointing out

---

whether the temptation emanated from a public source or a private one.
> "The doctrine of entrapment does not extend to acts of inducement on the part of a private citizen who is not acting in cooperation with, or as an agent of, a law enforcement official. *If the entrapment defense was conceived of as being based upon the notion that a person is not culpable whenever he engages in what would otherwise be criminal conduct because of the strong inducement of another person, this limitation would be open to serious question.* What this limitation reflects, then, is that the 'purpose of the defense is to deter misconduct in enforcing the law.'" (footnotes omitted) (emphasis supplied).

LaFave and Scott, § 5.2, at 422 *Criminal Law* (2d ed. 1986). *See also United States v. Mers,* 701 F.2d 1321 (11th Cir.1983) *cert. denied* 464 U.S. 991, 104 S.Ct. 482, 78 L.Ed.2d 679 (1983); *Henderson v. United States,* 237 F.2d 169 (5th Cir.1956).

**22.** On one earlier occasion, without the word entrapment even being used, the contention had been made to the Court of Appeals that a conviction is not permitted when the defendant has been enticed into the commission of the offense by a policeman. In a two-sentence disposition of the contention, the Court of Appeals simply noted that the question had not been raised below and was not, therefore, preserved for appellate review. *Hummelshime v. State,* 125 Md. 563, 569–570, 93 A. 990 (1915).

that it "is not objectionable for an officer of the law to lay a trap or unite with others to detect an offender." The holding was that there was not sufficient evidence of entrapment to require the Court of Appeals even to consider the viability of the doctrine.

Despite the fact that entrapment has been an issue calling for decision in the other 34 post-*Callahan* opinions of the Court of Appeals and of this Court, the procedural field nonetheless remains essentially unplowed. The reason for this neglect is easy to understand. In most cases, entrapment has not been the central issue but has been merely a peripheral "other contention" raised in its simplest form. That is where the appellant claims that entrapment was affirmatively established, as a matter of law, and that the appellant was, therefore, entitled to a directed verdict of not guilty.

*The Procedural Postures:*

To place the various entrapment issues that may arise in some kind of an organizational context, it is important to note that, generally speaking, appellate issues involving entrapment will take one of three procedural postures. These involve the three stages to which proof of entrapment in a given case may have advanced. The question "Has entrapment been established?" will yield one of three answers:

A. Yes, as a matter of law;

B. Yes or no, as a matter of fact; or

C. No, as a matter of law.

In procedural posture A, the defendant will be claiming on appeal that the affirmative establishment of entrapment, as a matter of law, entitled him to an acquittal—not at the hands of the jury but at the hands of the judge. If he was convicted in a court trial, the claim will be that the verdict of the judge was clearly erroneous. If he was convicted in a jury trial, the claim will be that the judge was legally in error in submitting the case to the jury. This is, essentially, where all of the Maryland appellate action has been.

The only procedural issue that may arise will be that of whether, in a jury trial, the defendant made the appropriate motion for a judgment of acquittal so as to preserve the sufficiency question for appellate review. *See Kenney v. State*, 62 Md.App. 555, 490 A.2d 738 (1985).

If the appellate court rules against the defendant on this issue of entrapment as a matter of law (as every Maryland decision thus far has done), the decision will not, except by way of gratuitous *dicta*, establish whether the proof of entrapment actually ended up at Stage C (no *prima facie* case; non-entrapment as a matter of law) or at Stage B (a genuine question of fact for the jury). That will not have been the question before the court. The decision will do no more than establish that the proof was at either Stage C or Stage B but had in no event attained Stage A (entrapment, as a matter of law). The frequent overly broad readings of this limited decision and the frequent carelessly broad statements of this limited decision are recurring sources of confusion. Issues in this procedural posture may arise in court or jury trials.

In procedural posture B, the establishment of entrapment will be a genuine issue of fact to be determined by a jury (or by the fact-finding judge in a court trial). It is only, however, in the context of a jury trial that appellate issues in this posture will arise. Here the issues will involve such procedural questions as what is the burden of persuasion—bare preponderance, clear and convincing, beyond a reasonable doubt? To which party is allocated the burden of persuasion? Is there a single issue with a single allocation of the burden of persuasion or are their multiple issues, possibly with different allocations of the burden as to different issues?

It is in this posture as well that the adequacy of jury instructions defining the elements of entrapment may be involved. Also involved may be questions about the type of evidence the State may use to show a defendant's criminal predisposition. *See Bowser v. State*, 50 Md.App. 363, 371–375, 439 A.2d 1, 5–8 (1981). In this procedural posture, on

the other hand, no question will ever arise with respect to a burden of production. That is a non-issue here. The only questions will involve the burden or burdens of persuasion, the correctness and adequacy of jury instructions, and the admissibility of evidence. Issues in this procedural posture will, by their very nature, arise only in jury trials.

In procedural posture C, the judge will have ruled that the defendant failed to establish a *prima facie* case of entrapment. He will, in effect, have ruled that there is non-entrapment, as a matter of law. The defendant will not be entitled to have the jury consider the issue of entrapment and there will, therefore, be no jury instructions on the subject. The appellate issue here will be whether the defendant did or did not establish a *prima facie* case. Also involved may be the sub-issue of what are the elements of entrapment as to which the defendant is required to establish such a *prima facie* case. Issues in this procedural posture also will, by their very nature, arise only in jury trials.

*Procedural Posture A—Entrapment As a Matter of Law:*

Since first recognizing the existence of entrapment in *Callahan* in 1932, all twelve Court of Appeals cases dealing with entrapment have arisen in this procedural posture, dealing with the single question of whether entrapment was established, as a matter of law. In 1952, the Court of Appeals decided *Ferraro v. State*, 200 Md. 274, 89 A.2d 628. In that first post-*Sorrells* case to be decided in Maryland, the Court of Appeals recognized the existence of the entrapment defense, pointing out that "This Court has never directly passed upon the defense of entrapment, because the question was not presented by any ruling in the record." 200 Md. at 279, 89 A.2d 628. It referred to the earlier allusions to entrapment, however, in *Hummelshime v. State, supra,* and *Callahan v. State, supra.* It summarized fully the two different theories of entrapment expressed by the Supreme Court in *Sorrells v. United States,* even as it concluded that it was not "necessary to decide which, if any, of the divergent views of the defense of

entrapment is law in Maryland." 200 Md. at 281, 89 A.2d 628. It was only necessary to decide that under any theory of entrapment, entrapment had not been affirmatively established, as a matter of law, and that the verdict of guilty, in a court trial, was not, therefore, clearly erroneous.

Since *Ferraro*, eleven additional Court of Appeals decisions have considered the entrapment defense. The issue in each of those cases has been in precisely the same posture as in *Ferraro*. In each, the defendant has claimed that entrapment was established as a matter of law and in each, the Court of Appeals has held that that was not the case. In three of the cases, defendants were appealing jury verdicts of guilty. In each, they claimed that because of the foreclosing effect of entrapment, as a matter of law, they were entitled to directed verdicts of not guilty and the trial judges were in error in submitting the cases to the jury. The Court of Appeals rejected all three claims. *Baxter v. State*, 223 Md. 495, 165 A.2d 469 (1960); *Lane v. State*, 226 Md. 81, 87–88, 172 A.2d 400 (1961); *Whyte v. State*, 229 Md. 459, 184 A.2d 738 (1962).

In the other eight cases, verdicts of guilty[23] had been handed down in court trials. In each of the eight cases, the defendants claimed that because of the affirmative establishment of entrapment, as a matter of law, the trial judges had been clearly erroneous in rendering their verdicts of guilty. Indeed, in a non-jury case, this is the only way in which the issue of entrapment could arise. The Court of Appeals rejected all eight claims. *Matthews v. State*, 228 Md. 401, 179 A.2d 892 (1962); *Stewart v. State*, 232 Md. 318, 193 A.2d 40 (1963); *Banton v. State*, 232 Md. 328, 193

---

**23.** In one of the eight cases, *Grohman v. State*, 258 Md. 552, 267 A.2d 193 (1970), the verdict literally was guilty of contempt of court rather than guilty of a crime. The contempt, however, was criminal enough in nature to make the defense of entrapment applicable as to it. As in the actual criminal cases, the Court of Appeals held that entrapment was not affirmatively established, as a matter of law, and that the trial judge was, therefore,. not clearly erroneous in rendering a verdict of guilty of contempt.

A.2d 46 (1963) *cert. denied* 375 U.S. 977, 84 S.Ct. 497, 11 L.Ed.2d 422 (1964); *Snead v. State,* 234 Md. 63, 197 A.2d 920 (1964); *Cross v. State,* 235 Md. 377, 201 A.2d 767 (1964); *Pointer v. State,* 239 Md. 641, 212 A.2d 260 (1965); *Smith v. State,* 242 Md. 712, 219 A.2d 16 (1966); and *Grohman v. State,* 258 Md. 552, 267 A.2d 193 (1970) *cert. denied* 401 U.S. 982, 91 S.Ct. 1204, 28 L.Ed.2d 334 (1971).

Other than for *Grohman v. State's* placing of its seal of approval upon our decision in *Simmons v. State,* 8 Md.App. 355, 259 A.2d 814 (1969), to adopt the subjective test of entrapment, following the Supreme Court majorities, rather than the objective test of entrapment, urged by the Supreme Court minorities, this has been the sum total of legal doctrine developed by the Court of Appeals on the subject of entrapment. There has been no discussion of what is required to establish a *prima facie* case so as to avoid a directed verdict of non-entrapment, as a matter of law. There has been no discussion, once a *prima facie* case had been established, of the elements as to which a jury must be persuaded; of the burden of persuasion itself; or of its allocation.

Turning to the decisions of this Court, on 26 prior occasions the subject of entrapment has been before us. As with the cases from the Court of Appeals and for precisely the same reason, most of our opinions have been singularly unenlightening. On nine occasions, following jury verdicts of conviction, defendants had claimed that the affirmative establishment of entrapment, as a matter of law, entitled them to directed verdicts of not guilty and that the trial judges thereby committed reversible error in submitting the cases to the juries. We rejected all nine such contentions. *Dolan v. State,* 1 Md.App. 292, 229 A.2d 443 (1967); *Gamble v. State,* 2 Md.App. 271, 234 A.2d 158 (1967); *Holt v. State,* 3 Md.App. 544, 240 A.2d 355 (1968); *Poff v. State,* 4 Md.App. 186, 241 A.2d 898 (1968); *DiNatale v. State,* 8 Md.App. 455, 260 A.2d 669 (1970); *Gill v. State,* 11 Md.App. 593, 597, 275 A.2d 505 (1971); *Berlin v. State,* 12 Md.App. 48, 58–59, 277 A.2d 468 (1971); *Perkins v. State,* 26 Md.

App. 526, 339 A.2d 360 (1975); *Bowser v. State,* 50 Md.App. 363, 439 A.2d 1 (1981).[24]

On nine other occasions, following convictions in court trials, defendants claimed that the affirmative establishment of entrapment, as a matter of law, rendered the guilty verdicts by the judges clearly erroneous. We rejected all nine of those contentions. *Jarrett v. State,* 1 Md.App. 448, 230 A.2d 683 (1967); *Simmons v. State,* 8 Md.App. 355, 259 A.2d 814 (1969); *Rettman v. State,* 15 Md.App. 666, 292 A.2d 107 (1972); *Hignut v. State,* 17 Md.App. 399, 303 A.2d 173 (1973); *Schuman v. State,* 19 Md.App. 400, 311 A.2d 460 (1973); *Lawson v. State,* 25 Md.App. 537, 335 A.2d 135 (1975); *Dravo v. State,* 46 Md.App. 622, 420 A.2d 1012 (1980); *Grindstaff v. State,* 57 Md.App. 412, 470 A.2d 809 (1984); *Sproates v. State,* 58 Md.App. 547, 473 A.2d 1289 (1984).

In summary, in 31 of the 34 post-*Callahan*, post-*Sorrells* Maryland cases to have considered the subject of entrapment,[25] the actual issue for decision was whether entrapment had been affirmatively established, as a matter of law, so as to entitle the defendant to a reversal, either 1) because the trial judge erroneously submitted the case to a jury or 2) because the trial judge, sitting as a jury, was clearly erroneous in arriving at a guilty verdict. In none of the cases did either appellate court find entrapment to have been established as a matter of law.

---

**24.** In one additional case, *Kenney v. State,* 62 Md.App. 555, 490 A.2d 738 (1985), our literal holding was that because the appellant there had failed to renew his motion for a judgment of acquittal at the end of the entire case, after having offered evidence, his contention that he, as a matter of law, had been entrapped, had not been preserved for appellate review. We noted, however, by way of considered *dicta,* that even if it had been preserved, we would have held it to have been without merit.

**25.** This does, to be sure, include the one decision where we actually held that the issue was not preserved for appellate review and revealed our feeling on the merits only by way of *dicta. Kenney v. State,* 62 Md.App. 555, 490 A.2d 738 (1985).

As a group, the cases have unfortunately been clustered in that appellate posture least conducive to the growth of any body of legal doctrine on the subject of entrapment. Our precedents on the other two procedural postures are few.

*Procedural Posture B—Entrapment as a Matter of Fact:*

Shedding light on the questions of what to do when the entrapment issue is in the hands of the jury is a single case (but an exceedingly well reasoned one). One of the two necessary holdings in *Bowser v. State,* 50 Md.App. 363, 439 A.2d 1 (1981), was that entrapment had not been established, as a matter of law, and that the trial judge, therefore, was not in error in permitting the case to go to the jury.

The second holding was that the trial judge committed error in admitting untrustworthy hearsay evidence before the jury as the State sought to prove the defendant's criminal predisposition. Although the entrapment defense may open up areas of substantive inquiry not ordinarily accessible to the prosecution, such as the defendant's basic character and criminal predisposition, the ordinary rules of evidence for pursuing those inquiries still abide. We held, at 50 Md.App. 375, 439 A.2d 1:

"[S]uspicion, rumor, secondhand reputation evidence, and other unreliable hearsay normally barred by rules of evidence do not individually or collectively become admissible merely because the defendant has raised the defense of entrapment.

By asserting the defense, however, the defendant does place predisposition in issue, and prior convictions for similar offenses, prior similar criminal acts, and other probative evidence of state of mind are admissible to assist the trier of fact in determining whether the police ensnared in their net an innocent lamb lured astray, or a predatory wolf pursuing the bait."

In discussing the procedural incidents when the entrapment question is properly before the jury, *Bowser* con-

sidered both the level of the burden of persuasion and its allocation. The indispensable service of this thoroughly researched and meticulously analyzed opinion of Judge Chasanow, however, was that it extirpated from the procedural field (or should have, if read and followed) some vines of doctrinal confusion that were well on their way to choking off more rational growth. The effort in *Bowser* was doubly heroic because of the Olympian credentials of some of the sources of the misbegotten and intertwining strands and because of their gradually lengthening pedigrees. *Bowser* cut the Gordian knot.

The original source of confusion (perhaps even error) was no less a figure than Judge Learned Hand. Even Homer nods. The prosecution that ultimately led to the Supreme Court decision of *Sherman v. United States,* 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958), went to the Second Circuit Court of Appeals twice before making it to the Supreme Court. On the first occasion, Judge Hand, writing for the Court, reversed the conviction in the District Court and remanded for a new trial. *United States v. Sherman,* 200 F.2d 880 (2d Cir.1952). The reason for the reversal was that a supplemental jury instruction on entrapment was erroneous. The source of future confusion, however, came in *dicta.*

The only predecessor case on entrapment that Judge Hand felt called upon to analyze was the only Supreme Court pronouncement on the subject then extant, *Sorrells v. United States,* 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932). Judge Hand properly distilled from *Sorrells* the fact that the entrapment defense consists of two elements. They are classically stated as they were restated in *Bowser* at 50 Md.App. 368–369, 439 A.2d 1:

"Entrapment occurs when a police officer or government agent induces the commission of a crime by one who, except for the government's enticement, solicitation or persuasion, would not have committed the crime. The test requires two inquiries:

'(1) [W]hether there was an inducement on the part of the government official ... and if so

(2) [W]hether the defendant showed any predisposition to commit the offense.' "

Judge Hand then somehow came up with a conceptualization of the two elements and of their relationship that was not to be found in *Sorrells*. Instead of looking upon the two elements as both necessary conditions for a successful entrapment defense, he seemed to conceptualize the first element—the inducement—as the "defense" itself and the second element—predisposition—as the government's possible "reply" to the defense. Out of this, he wove, in *dicta*, the following conclusion, 200 F.2d at 882–883:

"Therefore in such cases two questions of fact arise: (1) did the agent induce the accused to commit the offence charged in the indictment; (2) if so, was the accused ready and willing without persuasion and was he awaiting any propitious opportunity to commit the offence. On the first question the accused has the burden; on the second the prosecution has it."

The cause for this illusion that there are opposing burdens is semantic. The appearance of such a phenomenon arises almost automatically out of the typical way in which the entrapment defense is phrased. The elements of the defense are traditionally stated in the affirmative, which is ordinarily good conventional usage. The first element, therefore, ends up being asserted in terms of what a defendant must show, whereas the second ends up being asserted in terms of what the prosecutor must show. A consistency in looking at the elements from a fixed vantage point (the defendant's or the State's but not both) would, of course, be much more desirable. It would result, however, in the mixing of affirmative and negative statements. Doctrinally, the elements of the defense that an accused must establish to make a *prima facie* case are:

1. The *presence* of an inducement, and
2. The *absence* of a predisposition.

Conversely, the State's burden of persuasion to overcome such a *prima facie* case is to prove:

1. The *absence* of an inducement, and/or
2. The *presence* of a predisposition.

Unfortunately, the definitions seldom come out that way. The linguistic imperative of parallelism prevails over doctrinal consistency and we get a mish-mash of a definition combining the *presence* of an inducement with the *presence* of a predisposition. We typically end up, simply through thoughtless phrasing, with a hybrid definition that combines the first half of the burden of production with the second half of the burden of ultimate persuasion. This is why our procedures get mixed up. Out of just such a semantic happenstance or quirk of language has arisen the misperception that these are separate and bi-directional burdens of persuasion.

It is even understandable why the traditional phraseology took the turn it did. Although a defendant must prove both elements as part of his burden of production, his major effort will generally be made as to the first—the inducement. It was inducement, therefore, that enjoyed the affirmative phrasing. Although the State may disprove either element as part of its counter burden of persuasion, its major effort will generally be made as to the second. It was predisposition, therefore, that enjoyed the affirmative phrasing—the usage "predisposed" rather than "non-predisposed" ends up in the definition. As a result, the mind is required to shift viewpoints halfway through the definition. Language plays tricks on us and, fifty years later, we have no idea how certain things came to be.

The whole notion of separate burdens of persuasion going in opposite directions might have been avoided if Judge Hand had focused on the more singular statement in *Sorrells v. United States* where, at 287 U.S. 448, at 53 S.Ct. 215, it defined entrapment as "the instigation by government officials of an act on the part of *persons otherwise innocent* in order to lure them to its commission and to

punish them." (emphasis supplied). From that definition, the initial burden is more readily perceived as being on the defendant to prove that he was "otherwise innocent" rather than on the prosecution to prove that he was criminally predisposed.

Indeed, the Supreme Court's most recent stating of the definition, through Chief Justice Rehnquist in *Mathews v. United States*, 485 U.S. 58, 63, 108 S.Ct. 883, 886, 99 L.Ed.2d 54, 60–61 (1988), proceeds from the fixed vantage point of what the defendant must show to establish a *prima facie* case:

> "[A] valid entrapment defense has two related elements: government inducement of the crime, and a *lack of predisposition* on the part of the defendant to engage in the criminal conduct." (emphasis supplied).

This more careful stating of the definition helps us avoid the semantic snare to which earlier statements exposed us.

Judge Hand's conceptualization of the defense as one involving opposing burdens of persuasion has been almost universally rejected. To be sure, his own Second Circuit still utilizes his suggested approach. *United States v. Braver*, 450 F.2d 799, 801–803 (2d Cir.1971). Every other federal circuit, however, considers the defendant to have the initial burden of production as to both inducement and lack of predisposition and, if a *prima facie* case be established, the prosecution to have the ultimate burden of persuasion beyond a reasonable doubt to negate the defense by showing either the lack of an inducement or the presence of a criminal predisposition. *Sagansky v. United States*, 358 F.2d 195, 202–203 (1st Cir.1966); *Kadis v. United States*, 373 F.2d 370 (1st Cir.1967); *United States v. Watson*, 489 F.2d 504, 509 (3d Cir.1973); *United States v. Groessel*, 440 F.2d 602, 606 (5th Cir.1971); *United States v. Marren*, 890 F.2d 924 (7th Cir.1989); *Notaro v. United States*, 363 F.2d 169, 175 (9th Cir.1966); *United States v. Christopher*, 488 F.2d 849, 851 n. 1 (9th Cir.1973); *United States v. Ortiz*, 804 F.2d 1161 (10th Cir.1986); *Johnson v. United States*, 317 F.2d 127, 129 n. 2 (D.C.Cir.1963).

In larger terms, this is the only approach that makes sense. When a party has a burden of production on an issue—*e.g.* primary negligence, the existence of a contract, a legally sufficient case of burglary, a defense of entrapment—it bears the onus of producing some credible evidence which, if believed, would establish each and every necessary element of the thing to be proved. The burden of production is not to establish a *prima facie* case of inducement but to establish a *prima facie* case of entrapment (in all of its parts). If the *prima facie* case is established and the question is submitted to a jury, one party or the other then assumes the burden of persuasion. It is either for the State to persuade the jury that entrapment did not occur or for the defendant to persuade the jury that entrapment did occur. In either context, the thing to be proved is *entrapment* (not just a part of entrapment).

Although generally rejected elsewhere, Judge Hand's notion of separate and opposing burdens of persuasion found initial favor in Maryland. *Simmons v. State,* 8 Md.App. 355, 259 A.2d 814 (1969), involved a very limited issue. The literal holding was that entrapment had not been established as a matter of law and that the trial judge was not, therefore, in error in having submitted the case to the jury. *Simmons,* however, engaged in extensive *dicta.* Some of the *Simmons dicta* adopted the Learned Hand *dicta.* After quoting at length and with approval the critical language of Judge Hand from *United States v. Sherman,* 200 F.2d 880 (2d Cir.1952), at 8 Md.App. 361–362, 259 A.2d 814, *Simmons* went on, at 8 Md.App. 364–365, 259 A.2d 814, to restate the notion in its own words:

"The defense of entrapment having been raised, the issue of whether a defendant has been entrapped is for the trier of fact as part of its function of determining the guilt or innocence of the accused. Thus it is a matter of the sufficiency of the evidence. *The burden as to the first question*—did the police, directly or through their agent, induce the defendant to commit the offense charged in the indictment—*is on the defendant. This*

*may be established by a preponderance of the evidence. The burden as to the second question*—was the defendant's criminal conduct due to his own readiness and not to the persuasion of the police, that is, did he have a predisposition to commit the offense—*is on the State. This must be established beyond a reasonable doubt.* (footnotes omitted) (emphasis supplied).

*Simmons* actually added a wrinkle that was nowhere to be found in the opinion of Judge Hand. Not only were there to be two burdens of persuasion moving in opposite directions but the levels of persuasion were to be different as well. The defendant was required to persuade the jury that an inducement occurred by a bare preponderance of the evidence. Then the State was required to persuade the jury that the defendant was criminally predisposed beyond a reasonable doubt. Compounding the problem is that although this statement in *Simmons* is only *dicta,* it is *dicta* which, locally, through constant repetition, has taken on almost patriarchal status.

*Bowser* has been the antidote. Judge Chasanow recounted, without any remote suggestion of disapproval, the trial judge's instructions to the jury which placed the burden of persuasion, at the beyond a reasonable doubt level, on the State with respect to both aspects of the entrapment defense:

> "The trial judge instructed the jury on the issue of entrapment and further instructed to the effect that where the defense of entrapment is raised, *the State has the burden of proving beyond any reasonable doubt that the defendant was not induced* by a state agent to violate the law. *If the State fails to prove the defendant was not induced, then* in order to convict, *the jury would have to find beyond any reasonable doubt that the defendant was ready and willing to commit the crime charged."* (emphasis supplied).

50 Md.App. at 367, 439 A.2d 1. *Bowser* also noted that, without any parsing of the defense into constituent elements, the State had conceded that "the State had the

burden of proving beyond any reasonable doubt that the defendant was not entrapped." 50 Md.App. at 367 n. 4, 439 A.2d 1.

*Bowser* then indicated that the cases of *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), *Evans v. State,* 28 Md.App. 640, 349 A.2d 300 (1975), and *State v. Evans,* 278 Md. 197, 362 A.2d 629 (1976), cast some doubt upon the constitutional propriety, under the Due Process Clause, of placing a burden of persuasion on the issue of inducement upon a defendant, after the defendant had successfully met his burden of production in that regard. Judge Chasanow then effectively, at 50 Md.App. 367 n. 4, 439 A.2d 1, ended the argument by quoting Park, *The Entrapment Controversy,* 60 Minn.L.Rev. 163, 262–263 (1971):

> "[M]odern case law indicates that while the defendant has the burden of production on the issue of inducement, he does not have the burden of persuasion. To raise an issue for the jury, he need only produce, through government witnesses or otherwise, some evidence that government agents induced the offense. He need not persuade the trial judge that the evidence is credible. Nor is he required to persuade the jury. Almost every federal court of appeals that has considered the issue has disapproved jury instructions placing the burden of persuasion upon the defendant on the issue of inducement. (footnotes omitted)."

■ Once a defendant has met his burden of production by establishing a *prima facie* case of entrapment in all of its aspects, then the burden of persuasion falls upon the State to persuade the jury beyond a reasonable doubt that entrapment has not occurred. It may do this by persuading the jury that any of the necessary elements of entrapment did not exist. *See United States v. Rodriguez,* 858 F.2d 809, 814–815 (1st Cir.1988); *United States v. Groessel,* 440 F.2d 602, 606 (5th Cir.1971).

*Procedural Posture C—Non–Entrapment As a Matter of Law:*

In this final procedural posture, the judge will have ruled, as a matter of law, that there was non-entrapment. The literal ruling will have been that the defendant failed to make out a *prima facie* case. The jury, therefore, will have received no instructions on the subject of entrapment. The jury, moreover, will not even have been allowed to speculate about something which, for it, was a non-issue. By its very nature, this procedural problem will arise only in the context of a jury trial. The single appellate issue will be whether the defendant, as a matter of law, made out a *prima facie* case.

Three decisions of the Court of Special Appeals have considered this issue. They are *Byrd v. State*, 16 Md.App. 391, 297 A.2d 312 (1972); *Fisher v. State*, 28 Md.App. 243, 345 A.2d 110 (1975); and *Adcock v. State*, 66 Md.App. 454, 504 A.2d 1160 (1986). IT IS OUR CONCLUSION THAT THE FIRST OF THESE, *BYRD v. STATE*, WAS WRONG-LY DECIDED. WE HEREBY OVERRULE IT. It was flawed in several regards and we will consider each of them in turn. Basically, it adopted a faulty framework of analysis. It was the third installment of what we deem to have been the Learned Hand—*Simmons v. State*—*Byrd v. State*—strain of confusing (and perhaps confused) analysis.

### a. Byrd v. State: A False Light

It is *Byrd v. State*, of course, on which the appellant in this case, quite understandably, places his major reliance.[26] The facts in *Byrd* were sufficiently similar to the facts in

---

**26.** The appellant, to be sure, also cites *Dravo v. State*, 46 Md.App. 622, 627 n. 3, 420 A.2d 1012 (1980). The holding in *Dravo*, however, was that entrapment had not been affirmatively established as a matter of law and the verdict of the trial judge, sitting without a jury, was not, therefore, clearly erroneous. It did not have before it the issue of a *prima facie* case. It was not even reviewing a jury trial. The appellant's reliance is exclusively on a three-line *dictum* in a footnote citing *Byrd v. State* as its single authority. The fortunes of the *Dravo dictum* will, therefore, rise or fall with those of *Byrd* itself.

the present case to make it an attractive analogue. An undercover policeman, working through an informant, purchased $20 worth of heroin from the defendant Byrd. Byrd's defense was entrapment. He testified that one of the two undercover informants working with the police pleaded with him for twenty minutes to sell him heroin to give to "sick friends." Byrd protested that he was reluctant to sell the heroin because he was addicted to it and needed it for his own use. Significantly, he acknowledged that he was "in the business of selling heroin" but "merely to support my own habit."

At the end of the entire case, the trial judge ruled that a *prima facie* case of entrapment had not been established. He declined to give any jury instructions on the subject. *Byrd* reversed that decision of the trial judge. We conclude that the *Byrd* analysis was faulty in two significant respects: the first, general; the second, more specific.

### b: Flaw No. 1: An Exaggerated Sense of the Jury's Role

Even before we turn to its precise holding, we note that the *Byrd* opinion betrays an exaggerated sense of the role of the jury in resolving entrapment issues, a misperception that permeates the opinion. Instead of a careful analysis of the respective roles of jury and court, burdens of persuasion for the one but burdens of production for the other, there is an almost exalted view of the jury function on the subject of entrapment. The reason for the misperception is readily understandable. It involves a pitfall so basic and common that it deserves to be analyzed fully.

The case law abounds in broad, bold statements about entrapment's being characteristically a jury issue. It is an ABC of first semester Legal Method, however, never to take a statement, no matter how rhetorically attractive, as true, without careful and constant reference back to its originating context. Pronouncements lifted from context do not travel well. Such statements about the jury's role were correct in the limited seedbeds in which they sprouted. Once uprooted, however, they take on the appearance of

universal verities. Many an unwary reader (including judicial opinion writers), oblivious of the generative context, has been led to transplant the attractive verity into all sorts of other settings in which it is sadly out of place.

Two particular situations have been especially prolific in giving rise to the broad, bold statements about entrapment being generally a question for the jury. One such context was the prominent and ongoing debate between the two competing theories as to the substantive nature of entrapment—the subjective test versus the objective test. "[U]nless it can be decided as a matter of law, the issue of whether a defendant has been entrapped is for the jury as part of its function of determining the guilt or innocence of the accused." *Sherman v. United States,* 356 U.S. 369, 377, 78 S.Ct. 819, 823, 2 L.Ed.2d 848, 854 (1958). "The question of entrapment is generally one for the jury, rather than for the Court." *Mathews v. United States,* 485 U.S. 58, 63, 108 S.Ct. 883, 886, 99 L.Ed.2d 54, 61 (1988).

Out of context, those statements seem attractive authority for the proposition that a judge should be quick to pass the entrapment issue to the jury and should be concomitantly hesitant to rule that a *prima facie* case has not been established. In context, of course, those statements did not remotely stand for any such thing. The statement in *Sherman* came as Chief Justice Warren, for the majority, was rejecting the argument of Justice Frankfurter, proponent of the alternative "objective test" conceptualization, that entrapment issues, as a matter of course, "should be decided by the judge, not the jury." The *Sherman* statement, moreover, was carefully limited by the proviso, "unless it can be decided as a matter of law." The entire discussion, in context, had nothing to do with when entrapment is an issue of law for the judge and when it is an issue of fact for the jury. It involved rather the very different ways in which the two competing conceptualizations of the entrapment defense handled actual issues of fact. Under the subjective test, such issues of fact were for the jury. Under the objective test, on the other hand, such issues of

fact were for the judge. The very different question of when something is an issue of fact and when it is an issue of law was not remotely before the Court. The second quotation on the subject, from *Mathews,* came simply in the course of a long paragraph giving a thumbnail sketch of the evolution of entrapment law, citing the quotation from *Sherman* as sole authority for its own summarizing statement.

The second prolific source of broad, bold statements about the jury's role is, as we have discussed above, the posture in which 31 of the 34 Maryland cases to have considered entrapment has arisen. The almost exclusive claim has been that entrapment was affirmatively established, as a matter of law, so as to have entitled the defendant to a judgment of acquittal.

In all such cases, the contention was rejected. The actual decisions were that the stage of proof of entrapment was at either Procedural Posture C (non-entrapment, as a matter of law; no *prima facie* case) or Procedural Posture B (a question of fact for the jury), but in no event Procedural Posture A (entrapment affirmatively established, as a matter of law). The statements of the decisions, however, were not always so precise. Procedural Posture B (a matter of fact for the jury) was the immediately abutting stage of proof to the one in issue and the opinions, therefore, frequently looked no further back than to it. Statements, therefore, abound that entrapment was a question for the jury when, more carefully qualified, they should simply have said that entrapment was, *at most,* a question for the jury. Out of context, however, they seem to take on the authority of holy writ.

The most immediate culprit for *Byrd's* having been led astray, however, was *Simmons v. State,* 8 Md.App. 355, 364–365 n. 7, 259 A.2d 814 (1969). The issue before the Court in *Byrd,* of course, was whether the trial judge had committed error in ruling that a *prima facie* case of entrapment had not been established and in not submitting the issue to the jury. In ruling on that issue, *Byrd* not only

relied exclusively on *Simmons* but more especially upon a single sentence of *dicta* in a far-ranging footnote of *Simmons* to the effect that entrapment issues are especially for the jury in Maryland because of Maryland's venerable and eccentric constitutional provision that in criminal cases, the jury is the judge of the law as well as of the facts. As it moved to its critical ruling on the *prima facie* case issue, *Byrd* stated its premises, at 16 Md.App. 403, 297 A.2d 312:

> "[U]nder *Simmons, supra,* the appellant was entitled to an instruction on the law of entrapment. *It was not, under the circumstances of this case, for the trial judge to decide as a matter of law that there was no entrapment. Under our Constitution, the jury in a criminal proceeding is the judge of both the law and the fact.* Maryland Constitution, Art. XV, § 5." (emphasis supplied).

A few lines further on, it quoted with approval the *Simmons dicta* that it relied upon as essentially dispositive:

> " 'In our jurisdiction, where the jury are the judge of the law as well as the facts, we think that both questions pertaining to the issue of entrapment must be for the jury.' *Simmons, supra,* at 365, n. 7 [259 A.2d 814]."

Proceeding from such a major premise, the syllogism in *Byrd* was fatally flawed at its outset. The constitutional provision that at the time of the *Simmons* and *Byrd* decisions had been Article XV, § 5 was, by a constitutional amendment in 1978, transferred *verbatim* and became Article 23 of the Declaration of Rights. It provides, in pertinent part:

> "In the trial of all criminal cases, the Jury shall be the Judges of Law, as well as of fact ..."

More recent case law has made it clear that that curious constitutional relic has, through the interpretative process, been shrivelled up to almost nothing. *Stevenson v. State,* 289 Md. 167, 179, 423 A.2d 558 (1980), held that, "the jury's role in judging the law under Article 23 is confined 'to resolv[ing] conflicting interpretations of the law [of the

crime] and to decid[ing] whether th[at] law should be applied in dubious factual situations.' " (emphasis omitted). *Montgomery v. State,* 292 Md. 84, 89, 437 A.2d 654 (1981) pointed out that the jury's right to judge the law "is limited to those instances when the jury is the final arbiter of the law of the crime." *In re Petition for Writ of Prohibition,* 312 Md. 280, 318, 539 A.2d 664 (1988) was surprisingly candid, "What it all boils down to now is that the jury's right to judge the law is virtually eliminated." *See also Barnhard v. State,* 325 Md. 602, 602 A.2d 701 (1992).

Although its *ratio decidendi* is less than meticulously spelled out, *Byrd* arguably casts some doubt upon the right of the trial judge ever to rule, as a matter of law, that a *prima facie* case of entrapment has not been established, thereby keeping the issue from the jury. More recent decisions of this Court, however, have made it clear that that is not the case. Judge Powers pointed out in *Fisher v. State,* 28 Md.App. 243, 249, 345 A.2d 110 (1975):

> "*The initial test of the evidence,* within the framework of the substantive law of entrapment, *is always a matter of law for the court.*" (emphasis supplied).

*Fisher* affirmed the decision of the trial court not to submit the issue of entrapment to the jury. *See also Bowser v. State,* 50 Md.App. 363, 369, 439 A.2d 1 (1981); *Kenney v. State,* 62 Md.App. 555, 566, 490 A.2d 738, 743 (1985).

In *Adcock v. State,* 66 Md.App. 454, 504 A.2d 1160 (1986), we also affirmed the decision of the trial court that a *prima facie* case of entrapment had not been established and that there was, therefore, no genuine factual issue for the jury to consider. Pointing out that such a ruling is always one for the court to make, as a matter of law, we held, at 66 Md.App. 456, 504 A.2d 1160:

> "It is necessary that there be generated a legally sufficient *(prima facie)* case, with the burden of production squarely allocated to the proponent of the defense, as to both 1) improper inducing behavior on the part of the government and 2) the actual succumbing to that inducement on the part of the defendant.

We have no difficulty in holding in the case at bar that there was an utter failure of the appellant to make out a *prima facie* case of entrapment."

*Fisher* and *Adcock* are in the mainstream of American law on this procedural issue. As LaFave and Scott, *Criminal Law* § 5.2, at 428 (2d ed. 1986), pointed out:

"Traditionally, the entrapment defense has been regarded as a matter for the jury rather than for determination by the judge. (Even where this is unquestionably the case, *the judge may rule on the sufficiency of the proof to raise the issue in the first place ...*" (emphasis supplied).

The burden of production, thus, is squarely cast upon a defendant. That burden consists of making out a *prima facie* case of *entrapment*—not of one of the elements of entrapment, not of part of entrapment, but of *entrapment.* The burden of production on entrapment is no different than the burden of production on any other *probandum.* It requires offering some competent evidence which, if believed, could establish each and every necessary element of the defense. It remains finally to consider, therefore, what are the elements of entrapment.

### c: Flaw No. 2: A Misreading of Learned Hand and of Simmons

A close reading of *Byrd* reveals that implicit in its analysis seems to be a fundamental misreading of its precedential authorities, particularly *Simmons v. State,* 8 Md. App. 355, 364–365, 259 A.2d 814 (1969). *Byrd* seems to have taken the dichotomy between the opposing sub-burdens of persuasion and to have mistaken it for the very different dichotomy between the burden of production and the burden of persuasion. This may or may not have been a misreading of what Judge Hand had to say about shifting burdens. In *United States v. Sherman,* 200 F.2d 880 (1952), Judge Hand's statement was simply too vague to permit one to state with certainty whether he was distinguishing between the burden of production and the burden

of persuasion or whether he was distinguishing between two opposite sub-burdens within the more limited context of the burden of persuasion.

With respect to *Byrd's* primary precedential authority, the *Simmons* case itself, there can be no doubt. When *Simmons* talked about allocating to the defendant the burden of proving an inducement and to the State the burden of proving a predisposition,[27] it indisputably was speaking within the context of burdens of persuasion before the jury. It prefaced its reciprocal allocation of opposing burdens with the clear statement that this is what happens before "the trier of fact" after a *prima facie* case has already been established:

> "*The defense of entrapment having been raised, the issue* of whether a defendant has been entrapped *is for the trier of fact* as part of its function of determining the guilt or innocence of the accused." (emphasis supplied).

*Simmons,* 8 Md.App. at 364, 259 A.2d 814. *Simmons* was not remotely speaking about what a defendant must do to establish a *prima facie* case. The subject of a *prima facie* case was not under discussion. It was rather within the limited context of how to instruct a jury, after a genuine dispute of fact had been submitted to it, that *Simmons* allocated the burdens of persuasion. It did more than allocate. It calibrated the opposing burdens of persuasion at two different levels, saying at 8 Md.App. 365, 259 A.2d 814:

> "The burden as to the first question ... is on the defendant. This may be established by a preponderance of the evidence. The burden as to the second question ... is on the State. This must be established beyond a reasonable doubt."

---

**27.** As we have already pointed out, that splitting, by the *Simmons dicta,* of the burden of persuasion into two sub-burdens moving in opposite directions was wrong, as has since been pointed out by *Bowser v. State,* 50 Md.App. 363, 439 A.2d 1 (1981).

Indeed, as Judge Powers pointed out in *Fisher v. State*, 28 Md.App. 243, 345 A.2d 110 (1975), burdens of persuasion—bare preponderance, clear and convincing, beyond a reasonable doubt—are only matters of concern to the jury in resolving a dispute of fact. When a judge is determining, as a matter of law, whether a *prima facie* case has been established at one end of the spectrum or whether a directed verdict on entrapment is appropriate at the other end of the spectrum, levels of persuasion are immaterial:

> "In this test of legal sufficiency, the court is not concerned with any burden of proof. A burden of proof is a yardstick used only by the trier of the facts in performing the function of assessing weight and credibility of evidence."

*Fisher*, 28 Md.App. at 251, 345 A.2d 110. When one is talking about a *prima facie* case, one does not even mention levels of persuasion.

It seems clear, however, that the *Byrd* opinion distilled from this *dicta* in *Simmons* the mistaken notion that *the burden of production is on the defendant* to show inducement alone and then *the burden of persuasion is on the State* to show, if it can, predisposition. The effect is to permit the defendant to establish a *prima facie* case by showing some credible evidence of a single element of the defense of entrapment, an inducement, and to be relieved of any obligation to show even a *prima facie* case as to the other element, the lack of a predisposition. Relying exclusively upon the *Simmons dicta*, *Byrd* held that evidence of inducement alone was enough, *ipso facto*, to establish a *prima facie* case of entrapment:

> "We think the testimony of *the defense* to have *raised the issue* of entrapment *through testimony showing that the appellant was induced* by the police, or through their agent, to commit the offense charged. *Ergo, under Simmons, supra, the appellant was entitled to an instruction* on the law of entrapment. It was not, under the circumstances of this case, for the trial judge to

decide as a matter of law that there was no entrapment."
(emphasis supplied).

*Byrd,* 16 Md.App. at 403, 297 A.2d 312. We state unequivo-
cally that that principle of law for which the *Byrd* decision
seems clearly to stand is wrong and that the appellant's
reliance on *Byrd* is, therefore, misplaced.

Governmental inducement is not all there is to a *prima
facie* case of entrapment. It is an indispensable element
that the governmental action "implant in the mind of an
innocent person the disposition to commit the alleged of-
fense." *Sorrells v. United States,* 287 U.S. at 442, 53 S.Ct.
at 212-213. *Sorrells* speaks again of entrapment victims as
"persons otherwise innocent." 287 U.S. at 448, 451, 53
S.Ct. at 215, 216. *Sherman v. United States* talks, at 356
U.S. 372, at 78 S.Ct. 821, of "tempting innocent persons into
violations" and of the critical distinction between the "un-
wary innocent" and the "unwary criminal," 356 U.S. at 372-
373, 78 S.Ct. at 821. The otherwise innocent character of
the entrapped is an integral affirmative element of the
offense. As *United States v. Russell* summarized the
Supreme Court's holdings, at 411 U.S. 433, at 93 S.Ct. 1643,
"[T]he principal element in the defense of entrapment was
the defendant's predisposition to commit the crime." Sum-
marizing the Supreme Court law on entrapment, *Kadis v.
United States,* 373 F.2d 370, 374 (1st Cir.1967), pointed out
that the Supreme Court had "never distinguished between
the issues of inducement and predisposition, nor condemned
the act of inducement apart from its effect on an innocent
man."

The standard academic authorities are in complete accord
that there are two elements in entrapment and that to meet
the initial burden of production, therefore, the defendant
must offer some credible evidence as to each. LaFave and
Scott, *Criminal Law* (1st ed. 1972) § 48, at 371, defines
entrapment:

"[F]or entrapment to be established, (1) the government
must, for the purpose of obtaining evidence, originate the
crime and induce the defendant to commit it; *and* (2) *the*

*defendant must be an 'innocent' person who would not have committed a crime of this sort had he not been thus induced."* (emphasis supplied).

Whitebread and Slobogan, *Criminal Procedure* (2d ed. 1986) § 19.04, at 453, is explicit about the burden being on the defendant with respect to both aspects of the defense:

"Entrapment as a matter of law exists *only if the defendant can show:*

(1) that the offense was induced by the government ... *and*

(2) *that he was not predisposed to commit the type of offense charged ...*" (emphasis supplied).

### d.  The Burden of Production: The Federal Case Law

Despite the paucity of guidance from the Supreme Court and the Maryland case law on precisely what elements need be established to meet the burden of production, the decisions from the United States Courts of Appeals are legion and are enlightening.  A pioneer case was *Kadis v. United States, supra.*  It looked to inducement and predisposition as inseparable peas in the same pod, with the burden of production going to both:

"We find, in sum, that consideration of inducement as a separate issue serves no useful purpose, and we believe it to be a mistake.  We will no longer bifurcate entrapment into sub-issues of inducement and predisposition ... Henceforth we will look, singly, at the ultimate question of entrapment.  If the defendant shows ... some indication that a government agent corrupted him, the burden of disproving entrapment will be on the government; but *such a showing is not made simply by evidence of a solicitation.  There must be some evidence tending to show unreadiness."*  (footnote omitted) (emphasis supplied).

*Kadis,* 373 F.2d at 373–374.

The First Circuit has been prolific on what it imaginatively calls the "entry-level" burden.  Holding that a *prima*

*facie* case had not been established, *United States v. Coady*, 809 F.2d 119 (1st Cir.1987), observed at 122:

> "Only if a defendant makes out a threshold showing that a government agent turned him from a righteous path to an iniquitous one does the government's obligation affirmatively to disprove entrapment mature.
>
> *As part and parcel of his entry-level burden, the defendant must adduce evidence tending fairly to show his unreadiness to commit the offense.*" (emphasis supplied).

*See also United States v. Murphy*, 852 F.2d 1, 5 (1st Cir.1988) ("The defendant has the initial burden to show some evidence that he was unready to commit the crime."); *United States v. Polito*, 856 F.2d 414, 416 (1st Cir.1988) ("The initial showing necessitates some evidence on each of the two prongs of the defense: inducement and unreadiness."); *United States v. Rodriguez*, 858 F.2d 809, 812 (1st Cir.1988) (quoting *Polito*, 856 F.2d at 416) ("We note that the 'initial showing necessitates some evidence on each of the two prongs of the [entrapment] defense: inducement and unreadiness.' ").

The decisions from the Fourth Circuit are to the same effect. *United States v. Osborne*, 935 F.2d 32, 38 (4th Cir.1991), discussed the burden of production:

> "*Entrapment is an affirmative defense and the initial burden is on the defendant to go forward with evidence beyond a mere scintilla* that the government induced him to commit *an offense he was not otherwise predisposed to commit.* The question of entrapment is generally for the jury, because it raises the issue of whether the criminal intent originated with the defendant or with the government's agents. Nevertheless, *a defendant who is unable to carry his burden forward is not entitled to submission of the issue to the jury.* The district judge has the duty of determining whether or not the defendant has met this initial burden." (citations omitted) (emphasis supplied).

Indeed, in *United States v. DeVore*, 423 F.2d 1069 (4th Cir.1970), *cert. denied* 402 U.S. 950, 91 S.Ct. 1604, 29 L.Ed.2d 119 (1971), the Fourth Circuit adopted the position taken by the First Circuit, although its analysis wandered back and forth between whether the defendant's failure to show "unreadiness on his part" was a failure to show an independent second prong of the defense or whether it was simply a fatal erosion of a single prong called "inducement." In either event, the failure was fatal to the burden of production. The Fourth Circuit stated, at 423 F.2d 1071:

"In *Kadis* the First Circuit correctly formulated the rule: if the defendant, through government witnesses or otherwise, shows some indication that he was corrupted by government agents, the burden of disproving entrapment will be on the prosecution. *A showing of solicitation alone, however, will not suffice to place the burden of going forward with evidence on the government, since solicitation by itself is not the kind of conduct that would persuade an otherwise innocent person to commit a crime. The defendant, therefore, must also produce some evidence of unreadiness on his part,* or of persuasion by the agent. *Kadis* is novel only in expressing the rule in terms of burden of proof. It was previously well established that a defendant must show *prima facie* overreaching inducive conduct on the part of the government before the issue of entrapment would be submitted to the jury." (citations omitted) (emphasis supplied).

The Fifth Circuit not only followed this lead but, as part of the two-pronged analysis, actually moved the "lack of predisposition" up to first position. *United States v. Leon*, 679 F.2d 534, 538 (5th Cir.1982), affirmed the decision of the trial judge not to give an instruction on the subject of entrapment:

"In this Circuit, before the judge must instruct the jury on entrapment, *a defendant must show (1) lack of predisposition to commit the crime and* (2) some governmental involvement and inducement more than just pro-

viding the opportunity or facilities to commit the crime."
(emphasis supplied) (emphasis in original).

*See also United States v. Andrew,* 666 F.2d 915, 922 (5th
Cir.1982); *United States v. Anderton,* 679 F.2d 1199, 1201
(5th Cir.1982); *United States v. Fischel,* 686 F.2d 1082,
1085 (5th Cir.1982).

In *United States v. Jackson,* 700 F.2d 181, 186–187 (5th
Cir.1983), the trial court's decision that no jury instruction
was called for because a *prima facie* case had not been
established was affirmed. The key element was the defen-
dant's failure to show "a lack of predisposition on his part."
*Jackson,* 700 F.2d at 186. Affirmative evidence of the
defendant's criminal predisposition compounded his difficul-
ty in trying to make a threshold showing of lack of such
predisposition:

> "We need not decide whether the government did more
> than simply provide an opportunity for crime because
> Hicks has not shown a lack of predisposition on his part.
> *The evidence presented at trial,* however, *points to his
> predisposition* to participate in the scheme to purchase
> cocaine....
>
> ... [W]e hold that Hicks failed to make a showing that
> he was not predisposed to taking part in the conspiracy.
> Therefore, *an instruction on the defense of entrapment
> was not warranted."* (footnote omitted) (emphasis sup-
> plied).

*Jackson,* 700 F.2d at 186–187. The case thus stands for the
proposition that the State's evidence of predisposition need
not be held in reserve until it becomes necessary to over-
come the defendant's *prima facie* case but may actually be
considered in forfending the defendant's establishment of a
*prima facie* case in the first instance.

The Seventh Circuit is also in line. *United States v.
Marren,* 890 F.2d 924 (7th Cir.1989), affirmed the trial
judge's refusal to instruct the jury on entrapment. It
pointed out the necessary elements that a defendant must
prove to meet his initial burden of production, at 890 F.2d
929:

"A valid entrapment defense has *two related elements:* government inducement of the crime, *and a lack of predisposition* on the part of the defendant to engage in the criminal conduct. *The defendant's burden* to warrant an entrapment instruction, therefore, *is to produce evidence sufficient* for a reasonable jury *to find both a lack of predisposition* and inducement by the government. Instructions on the entrapment defense are not required if the defendant has not met his threshold responsibility." (citations omitted) (emphasis supplied).

The most articulate statement of both the "what" and the "why" of this "lack of predisposition" aspect of the burden of production is that by Judge Richard Posner in *United States v. Evans*, 924 F.2d 714 (7th Cir.1991). The Seventh Circuit affirmed the ruling of the trial court that no *prima facie* case of entrapment had been established and that no jury instructions were called for. Judge Posner pointed out that even a successful solicitation of a defendant who yields only reluctantly to that solicitation is not enough to establish the *prima facie* case, stating at 924 F.2d 716:

"The weakness in Evans's position is his belief that the defense of entrapment requires only that the defendant have been induced, in the sense of successfully solicited, by a government agent to commit the crime and that he have yielded to the solicitation with reluctance. That is an eccentric formulation. As usually formulated, *the defense requires the defendant to prove that he was* (1) induced by someone working for or on behalf of the government to commit a crime that he was (2) *not predisposed* to commit." (emphasis supplied).

Judge Posner went on to set out the reasoning which undergirds this indispensable element of the entrapment defense, as he observed at 924 F.2d 717:

"The centrality of predisposition can be seen by considering the purpose of the doctrine of entrapment. *It is to prevent the police from turning a law-abiding person into a criminal.* A law-abiding person is one who resists the temptations, which abound in our society today, to

commit crimes. *Such a person can be induced to commit a crime only* by grave threats, by fraud ... or, in the usual case in which entrapment is pleaded, *by extraordinary promises*—the sorts of promises that would blind the ordinary person to his legal duties." (citation omitted) (emphasis supplied).

The Tenth Circuit is also in line. *United States v. Ortiz,* 804 F.2d 1161 (10th Cir.1986), affirmed the decision of the trial judge that the defendant had not met his burden of production on the subject of entrapment. After distilling from statements of the Supreme Court the principle "that the underlying purpose of the entrapment defense is to protect an otherwise unpredisposed defendant from government coercion," it pointed out the twin aspects of the defendant's burden of production, at 804 F.2d 1165:

*"The defendant must point to evidence of both lack of predisposition* and government inducement before the trial judge can determine whether entrapment has been shown sufficiently to present it to the jury." (emphasis supplied).

█ The implication in *Byrd v. State* that a defendant may meet his burden of production on the defense of entrapment by showing legally sufficient evidence of an inducement without also showing legally sufficient evidence of a lack of predisposition is, in view of the overwhelming case law, utterly untenable.

### The Failure of the Appellant to Satisfy The Burden of Production

█ We hold that Judge Wise was not in error when he ruled that the appellant failed to make out a *prima facie* case of entrapment so as to entitle him to jury instructions on the subject. As we turn to why this is so, we cannot help but note that the two elements of the defense, at the edges, do blend into each other. Although it is a distinction without a difference, it is, at least under certain factual circumstances, debatable whether the two elements are so mutually exclusive as to permit separate analyses or wheth-

er they are rather two separate but closely related and partially overlapping aspects of an indivisible totality.

Acknowledging some overlap, we will nonetheless attempt to parse the components separately. In doing so, we hold that the appellant failed to establish a *prima facie* case with respect to either element of entrapment.

### A. The Inducement:

■ An inducement, by its very nature, contemplates more than a request and an affirmative response. It embraces, as well, the indispensable notion of an effective catalytic agent. It is more than a solicitation.[28] *Adcock v. State,* 66 Md.App. 454, 504 A.2d 1160 (1986). It is more even than a successful solicitation. It also requires something by way of the unresisted bait or the effective precipitating agent that actually seduced an otherwise virtuous person from the paths of righteousness into the ways of the ungodly. It involves that sort of "grave threat," "fraud," or "extraordinary promise," described by Judge Posner in *United States v. Evans,* 924 F.2d 714, 717 (7th Cir.1991), that can "blind the ordinary person to his legal duties." It requires, in a word, a catalyst.

It was not enough, therefore, for the appellant to show that confidential informant Wanda Hutson requested that he distribute marijuana to her. It was not enough to show that he responded affirmatively to that request. We see no catalytic factor in that exchange. We see nothing more than a simple request repeated three times within a space of ten minutes.

That Wanda Hutson repeated the request for the marijuana three times hardly constitutes what *Stewart v. State,*

---

**28.** As *United States v. Osborne,* 935 F.2d 32, 38 (4th Cir.1991) (quoting *Devore,* 423 F.2d at 1072), pointed out:

"[S]olicitation by itself is not the kind of conduct that would persuade an otherwise innocent person to commit a crime, or that would be 'so inducive to a reasonably firm person as likely to displace *mens rea.*'"

232 Md. 318, 321–322, 193 A.2d 40 (1963), referred to as "repeated and persistent solicitation of a previously law-abiding citizen in order to overcome his reluctance to commit a crime." The solicitations in *United States v. Evans*, 924 F.2d 714, came not thrice in ten minutes, as here, but in the course of five separate visits to the defendant's store over a period of three months. In *United States v. Velasquez*, 802 F.2d 104, 106 (4th Cir.1986), undercover agents telephoned the defendants "over thirty times" to suggest that they furnish cocaine before the defendants finally acquiesced. In terms of satisfying the burden of production, that thirty-fold repetition was not deemed enough to transmute an ultimately successful solicitation into an actual inducement. " 'A showing of solicitation alone, however, will not suffice to place the burden of going forward with the evidence on the government, since solicitation by itself is not the kind of conduct that would persuade an otherwise innocent person to commit a crime.' " 802 F.2d at 106 (quoting with approval *United States v. DeVore*, 423 F.2d 1069, 1071 (4th Cir.1970)).

That the appellant considered Wanda Hutson a friend hardly presented a trap for "the unwary innocent." In *United States v. Evans*, 924 F.2d 714, it was the defendant's high school classmate who was used as a government informant to solicit him. In *Fisher v. State*, 28 Md.App. 243, 253–255, 345 A.2d 110 (1975), the defendant claimed that he had been induced to distribute heroin by a confidential informant with whom he had been "close friends" for "six or seven years." We affirmed the trial judge's ruling that a *prima facie* case had not thereby been established, holding at 28 Md.App. 255, 345 A.2d 110:

"The ruling was clearly correct. The evidence was not sufficient to get Fisher over the first hurdle. There was utterly no showing of inducement. There was no legally cognizable issue involving the law of entrapment." (footnote omitted).

There was in this case no appeal by Wanda Hutson to the appellant's pity or compassion. The marijuana was not to

assuage Wanda Hutson's desperate addictive need nor for the succor of a sick friend nor to extricate Wanda Hutson from some dire straits. There was no pleading or begging of any sort. In *United States v. Fischel,* 686 F.2d 1082 (5th Cir.1982), the alleged inducement was pity for a friend. In holding that a *prima facie* case as to inducement had not thereby been established, the Court stated, at 686 F.2d 1086:

> "Ludwig told Fischel that he was taking some drugs to a friend and *Fischel replied 'I can't get involved in this.'* That appears to have been Fischel's first and last objection to participating in the sale. Fischel's overcoming of his reluctance because of pity for Ludwig does not represent evidence of government seduction of a defendant into the commission of a crime....
>
> In sum, Fischel's story does not reveal the sinews of government power tightening on an unwilling victim. Rather, *the most inducement that Fischel points to is his sympathy and pity for a friend.* This is not a case where it is alleged that a government agent played upon a naive and easily manipulated person, making tactical use of his victim's pliable nature." (emphasis supplied).

Even accepting the appellant's strained version of the facts, as we must, Wanda Hutson simply declared as she opened her conversation with the appellant that "she needed to make this deal with this person ... that she had befriended." In effect, she wanted to make a commercial sale of marijuana, a "deal," and asked the appellant to be her supplier. With only slight hesitation, and with nothing apparently to be gained, the appellant went for it.

His feeble explanation that he turned over the marijuana because 1) "I was doing it for a friend," or, shortly thereafter, because 2) "after a while, I got tired of listening to it so I just went ahead and give it to her" simply does not constitute adequate evidence of inducement. The appellant never explained why. We feel as did the Tenth Circuit, in ruling on the same issue, in *United States v. Ortiz,* 804 F.2d 1161, 1165–1166 (10th Cir.1986):

"To establish a triable issue, the defendant must point to evidence that is more than 'flimsy or insubstantial.' Thus, conclusory and self-serving statements, standing alone, will not suffice." (citation omitted).

The evidence reveals no catalyst. It reveals no bait, no ploy, no lure, no gimmick. It reveals no adequate cause for the effect. What was the irresistible (or, at least, the unresisted) temptation? What precipitated the appellant's change of heart? The appellant complains that he was caught in a governmental mousetrap. All that he shows us, however, is a mousetrap without any cheese in it. That is not enough.

### B. *The Lack of Predisposition:*

The appellant's evidence was equally bereft when it came to the other necessary element of an entrapment defense— the lack of readiness; the lack of a criminal predisposition on his part.

*United States v. Groessel,* 440 F.2d 602 (5th Cir.1971), discussed the type of evidence that might suffice for this purpose. There the evidence, which satisfied the burden of production, was that the defendant was "a fireman employed by the City of El Paso" and "enjoyed an unblemished reputation as an honest, law-abiding citizen." 440 F.2d at 606. *United States v. Rodriguez,* 858 F.2d 809 (1st Cir.1988), discussed the same element. The evidence of lack of predisposition was there held to be adequate to satisfy the burden of production.

"As opposed to many similar cases, there was no evidence at all of any previous criminal involvement on appellant's part—let alone any involvement in drugs. He was steadily employed in an honest job. There was no proof of high living. In short, apart from the subject transaction itself, there was nothing in Rodriguez's prior history which hinted that he was disposed to traffic in cocaine." 858 F.2d at 816.

Park, *The Entrapment Controversy,* 60 Minn.L.Rev. 163, 223 (1976), discussed how a defendant might go about proving lack of criminal predisposition:

"For example, he might offer evidence that he was regularly employed at a full-time job and that he was living within his income. More importantly, the defendant can point to the absence of evidence of prior crimes ..." (footnote omitted).

*And see United States v. West,* 511 F.2d 1083 (3d Cir.1975).

The appellant, whose burden it was, offered no evidence whatsoever that he was a law-abiding citizen of upstanding reputation and unblemished criminal record, regularly employed at a full-time job and living within his income. He offered no proof of lack of criminal predisposition.

At most, the appellant seeks solace in the fact that when Wanda Hutson asked him to supply the marijuana that she would then sell commercially, he hesitated and had to be asked three times. He was in that regard very like Caesar upon the Feast of Lupercal "when thrice the people offered him a kingly crown, which thrice he did refuse." The appellant apparently believes, with Marc Antony, that criminal predisposition "should be made of sterner stuff." In *United States v. Evans,* 924 F.2d 714 (7th Cir.1991), Judge Richard Posner, on the other hand, gives hesitation much shorter shrift, at 924 F.2d 718:

"Probably the caution, the hesitation, that Evans showed (always assuming that his testimony is believed) were just simple prudence in an illegal activity.... Our explanation for his hesitation may be debatable, but at most—giving him the benefit of every favorable inference possible—*that initial hesitation was a sting of conscience too quickly pulled to allow a reasonable jury to conclude that Evans lacked criminal predisposition....*

When a person accepts a criminal offer without being offered extraordinary inducements, he demonstrates his predisposition to commit the type of crime involved.... *Hesitation alone cannot create a jury question. The*

*defense was properly withheld from the jury."* (emphasis supplied).

The evidence in this case on the subject of predisposition actually pointed in the opposite direction. The appellant displayed familiarity with the illicit drug traffic. He apparently had a ready and available source of supply for marijuana. Even while claiming it was only for his personal use, he did not cautiously "stash" it at home for clandestine use under cover of darkness but carried it abroad with him, even upon social visits during the hours of the late morning. These are not the tell-tale characteristics of one innocent in the ways of the drug trade.

On the subject of criminal predisposition, moreover, the meaningful distinction is that between criminality and non-criminality, not that between felony and misdemeanor. The appellant acknowledged that he was a criminal on the very morning he claims to have been entrapped. He was guilty of the unlawful possession of marijuana. The distinction he seeks to make between a user and a dealer was not found to have been meaningful in *United States v. Evans*, 924 F.2d 714 (1991). There, the defendant claimed that "he was a purchaser of marijuana for personal use, not a dealer, was reluctant to become a dealer, and rebuffed the informant's solicitations the first five times that the informant visited him at the store." 924 F.2d at 716. The Seventh Circuit held that a *prima facie* case had not been established by the defendant. There was also a failure to make a *prima facie* case in *United States v. Marren*, 890 F.2d 924, 929 (7th Cir.1989), where the defendant acknowledged criminal conduct at the State level but claimed that he was entrapped into escalating his criminality up to the federal level. Such a claim availed him nothing. The driver of a getaway car might just as well claim that he had been entrapped into becoming the triggerman.

The clincher on the subject was the appellant's 1985 conviction for selling marijuana. The authorities are unanimously agreed that even prior similar crimes which never led to convictions, let alone prior convictions themselves, are

highly relevant on the subject of criminal predisposition. Park, *The Entrapment Controversy*, 60 Minn.L.Rev. 163, 200 (1976), observed:

> "Predisposition may be shown by evidence that the defendant had previously engaged in other criminal activity of the nature charged. This activity may be proven by prior convictions or by testimony about prior crimes which never led to conviction."

*United States v. Ortiz*, 804 F.2d 1161, 1165 (10th Cir.1986), stated unequivocally:

> "Predisposition may be inferred from a defendant's history of involvement in the type of criminal activity for which he has been charged ..."

The Maryland case law is completely in line. *Snead v. State*, 234 Md. 63, 66, 197 A.2d 920 (1964) (quoting *Stewart v. State*, 232 Md. 318, 193 A.2d 40), observed, "The appellant had a past record of narcotics law violations, and thus was not a 'previously law-abiding citizen.' " In *Bowser v. State*, 50 Md.App. 363, 372, 439 A.2d 1 (1981), (footnote omitted), we observed, "The State may use various permissible methods to rebut an entrapment claim. Among the most common, are proof of prior convictions for similar offenses and evidence of similar criminal acts committed by the accused." *See also United States v. Tyson*, 470 F.2d 381 (D.C.Cir.1972); *Carlton v. United States*, 198 F.2d 795 (9th Cir.1952).

### *Conclusion*

We hold that Judge Wise correctly ruled that the appellant had not met his burden of production and was, therefore, not entitled to have the jury instructed on the subject of entrapment. He failed to establish a *prima facie* showing that, in the words of Judge Chasanow in *Bowser v. State*, at 50 Md.App. 375, 439 A.2d 1, "the police ensnared in their net an innocent lamb lured astray" rather than a "predatory wolf pursuing the bait."

### Other Contentions: An Inducement is Non–Hearsay

The other contentions will not detain us long. The appellant's second contention is simply a shadow version of the first. He claims that he was erroneously precluded from testifying about the inducements made to him by Wanda Hutson and was thereby hindered in establishing the defense of entrapment. When the appellant started to describe Wanda Hutson's initial conversation with him, the State interposed a hearsay objection. The objection was sustained. The appellant was initially precluded from testifying as to the reason Wanda Hutson gave for wanting his marijuana.

■ In appellate argument, the State continues to maintain that the out-of-court assertion by Wanda Hutson was hearsay. That is gibberish. The burden is upon the defendant to establish an inducement by, *inter alia,* showing an enticement. Ninety-nine times out of a hundred, the enticement will be verbal rather than non-verbal. What that means is that an enticement is generally an out-of-court assertion. "I want you to give me the marijuana because" 1) "you will receive my undying love if you do"; 2) "you will receive $1,000 if you do"; 3) "I will kill you if you don't." The allegedly entrapped defendant must be permitted to describe the alleged inducement in more than merely conclusory terms because, as we have discussed above, some enticements are legally cognizable catalysts and others are not. To prove that he was induced, the defendant must be permitted to testify as to the siren song he heard and to which he responded.

The State's response is that he should call the siren herself to the stand. Frequently, the siren is a confidential informant no longer readily available. That observation, however, is not pertinent. The defendant's version of the siren song will, in any event, almost always be far more seductive and enthralling than either 1) the real thing or 2) the version to which the siren herself might testify.

Whether anyone will ever believe the defendant's version is beside the point. He is at least entitled to put his version on the table.

Hearsay, in its simplest formulation, is "an out-of-court assertion *offered* in court *for the truth of the thing asserted.*" In the context of a "sting" operation or other governmental entrapment, the enticement, by its very nature, is never the truth. The truth would be, "I want you to sell me the marijuana so I can arrest you and send you to jail." The truth's gain would be effective law enforcement's loss.

When the State poses a hearsay objection to the defendant's recounting of the siren's out-of-court declaration, it is presumptively on the theory that the State would prefer to have the declarant herself on the stand, under oath, and subject to cross-examination with respect to her assertions. If the defendant were thus compelled to call the siren to the stand, however, the State's cross-examination would not go to the truth of the lyrical content of the siren song itself but only to the fact that the lyrics were sung as they had been described. The State would already know that the lyrics were false for the State had invented them in the first instance. Besides, to what end would the State pursue its examination of the truth of the allegedly seductive declaration? If the enticement were exposed as a blatant lie (as the State, as the author of the clever investigative lie, would have to acknowledge), that would not serve to diminish one whit the efficacy of the enticement in terms of the entrapment defense. When our concern is only with whether the words were said (or sung) and not with whether the words were true, that is classic non-hearsay.

The law's concern is only 1) with whether the State's agent uttered the enticement, 2) with whether the defendant heard the enticement, 3) with whether the defendant acted on the enticement, and 4) with whether the enticement was, by its very nature, legally sufficient to be treated as a possible "inducement." The defendant should, therefore,

have been permitted to testify about what Wanda Hutson told him.

Having said all that, we nonetheless "upon [our] own independent review of the record, [are] able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict" and that such error was, therefore, harmless. *Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665, 678 (1976).

Defense counsel was asked to proffer what the appellant would have testified that Wanda Hutson had said. He proffered as follows:

"... [T]he defendant [would] testify that Wanda [Hutson] told him she needed to make this deal with this person whom she had befriended and that, despite the fact he said no several times, she pressed him to that point to ask him repeatedly if she could have whatever marijuana he had so she could sell it to Deputy Bradley."

The proffer, however, was only a starter. A review of the transcript makes it as clear as clear could be that in the course of the lengthy direct examination, cross-examination, and redirect examination of the appellant, every detail he had to offer as to what Wanda Hutson told him and as to why he ultimately turned over the marijuana to her was fully and completely exposed upon the face of the record. The appellant's development of his defense was not ultimately inhibited. It was only slightly delayed.

### Other Contentions: The Jury Instruction on Distribution

■ The appellant's final contention is almost too cosmic to get a handle on. He claims:

"The trial court violated Mr. Sparks' constitutional rights to notice and against double jeopardy, by constructively broadening the charge at the conclusion of trial."

The first count of the criminal information charged that the appellant "did distribute to Robert Bradley" the mari-

juana. At the end of the trial, Judge Wise proceeded to give a jury instruction with respect to distribution:

> "Now in addition the defendant is charged with a crime of distribution of marijuana which as I told you, is a controlled dangerous substance. In order to convict the defendant of this charge, the State must prove that the defendant sold, exchanged, transferred or gave away the substance. And secondly, that the substance was marijuana."

The appellant objected on the ground that since the information charged distribution to Robert Bradley, the instruction should have informed the jury that nothing less than the appellant's actual handing over of the marijuana to Robert Bradley would suffice for a conviction. Judge Wise declined to modify the instruction, observing: "I don't think that's the law that they have to prove the exact person under these circumstances. All of them in reasonable proximity to each other. I'm not going to slice it that thin."

Out of such humble origins now springs the three-fold argument that Judge Wise's failure to modify the jury instruction 1) broadened the charge against the appellant at the end of the trial from one of distributing to Robert Bradley specifically to one of distributing to anyone in the world generally, 2) deprived the appellant of his constitutional right to notice of the charges he was called upon to defend, and 3) somehow denied him, as well, his right against being placed twice in jeopardy.

At the trial level, however, nothing remotely touching upon either a deprivation of a constitutional right to notice or a denial of the right against being placed twice in jeopardy was even alluded to, let alone raised. There is nothing with respect to either of those claims that has been preserved for appellate review. In reply brief, the appellant alleges that such a response exalts form over substance. That is, mercifully, precisely what a preservation requirement does.

With respect to the third subcontention, however, there is

no such balm in Gilead.[29]  Both at the trial level and now in appellate briefs, defense counsel and the State alike are engaging in grandiose debate over such questions as:

1.  Since the name of Robert Bradley as the object of the distribution was pleading surplusage, in the first instance, is the State now limited to showing such a specific distribution or does it retain the latitude it would have enjoyed if Robert Bradley's name had never been included in the charge?

2.  Was Judge Wise's failure to limit his jury instruction a "constructive amendment" of the charging document and, if so, can such an amendment be made so late in the proceedings?

We flatly decline to follow counsel into such a doctrinal quagmire.  Involved here was a simple communications problem that needs to be dealt with practically as the molehill that it is rather than as the mountain that it threatens to become.  As any sentient auditor of the trial, presumably including the appellant, could not have helped but perceive, from first to last the State, undeviatingly, charged and proved the distribution of marijuana to Deputy Robert Bradley.  From square one, the investigative plan was to have the undercover policeman pose as a willing buyer, be introduced to the appellant by the Confidential Informant Wanda Hutson, and ultimately to make a purchase of marijuana from the appellant.  Under either the State's version or the appellant's version of the facts, that is precisely what occurred.

Under the State's version, the appellant handed Wanda Hutson the plastic baggie containing the marijuana as soon as he entered her home.  She, in turn, handed it to Deputy Bradley.  Both the conversation about the weight of the marijuana and the payment of the purchase price, however, were directly between Deputy Bradley and the appellant.  Even under the appellant's version, Wanda Hutson asked

---

**29.** Genesis 31:21 *et seq.*

him for his marijuana so that she could consummate her "deal" with Robert Bradley, then sitting in the adjacent room. Albeit following a brief hesitation, the appellant turned over the marijuana to Wanda Hutson knowing of its immediate destination, saw her go directly into the living room to consummate the sale and a few minutes later, at her beckoning, carried the scales from the kitchen to the living room for no conceivable purpose except to weigh the marijuana. Under either version, the marijuana, as an object of sale, went from the appellant's pocket into Robert Bradley's hands within a space of ten minutes and with the appellant's full knowledge.

The jury had a simple little question that might occur to anyone. Does distribution from the appellant to Robert Bradley contemplate that the appellant must deliver "seisin" of the marijuana physically from his hand directly into the hand of Robert Bradley or is it enough to do so indirectly through the intermediary of Wanda Hutson? The second time the jury came back requesting clarification, its question was precisely that:

"Does distribution include the use of a third party or go-between"?

In the Tinker-to-Evers-to-Chance combination, can Tinker be said to deliver the ball to Chance through the intermediary of Evers or does Tinker deliver the ball only to Evers and to no one else? Our answer is that Tinker delivers to either or to both.

The judge's declination to give any supplemental instruction permitted the jury to conclude, as they did, that delivery or distribution could be indirect as well as direct. We agree with that conclusion. Under the circumstances, the appellant's obsession with whether he placed the marijuana literally into the hands of Wanda Hutson rather than into the hands of the ultimate purchaser is much ado about nothing. The inconsequential distinction between "direct and indirect" became distorted into a distinction between "Bradley and others." What was nothing more than a question about the modality of the transfer, and could

easily have been explained in those terms, became magnified into a question about the ultimate recipient of the transfer. Without anguishing the point any further, we see no error.

*JUDGMENTS AFFIRMED;*

*COSTS TO BE PAID BY APPELLANT.*